UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NUNZIO CALCE; ALLEN CHAN; SHAYA
GREENFIELD; AMANDA KENNEDY;
RAYMOND PEZZOLI; SECOND AMENDMENT
FOUNDATION; and FIREARMS POLICY
COALITION, INC.,

                              Plaintiffs,

        -against-

CITY OF NEW YORK; and DERMOT SHEA, in
his official capacity as Commissioner of the New
York City Police Department,

                             Defendants.

---

No. 1:21-cv-08208-ER

 

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

David D. Jensen, Esq.
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
david@djensenpllc.com
*Attorney for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ *ii*

I)     INTRODUCTION .................................................................................................. 1

II)    MATERIAL FACTS............................................................................................... 2

     A)    The Challenged Statutes—New York Penal Law §265.01(1) and New
           York City Administrative Code §10-135—Broadly Prohibit the Possession
           of Stun Guns and Tasers ................................................................................. 2

     B)    The Defendants Threaten to Enforce the Challenged Statutes Against the
           Plaintiffs........................................................................................................ 5

III)    ARGUMENT ......................................................................................................... 8

     A)    THE PLAIN TEXT OF THE SECOND AMENDMENT PRESUMP-
           TIVELY PROTECTS THE TARGETED ARMS ................................................ 8

     B)    BECAUSE THE SECOND AMENDMENT PROTECTS THE TARGETED
           ARMS, THE GOVERNMENT MUST DEMONSTRATE THAT THEY
           ARE NOT IN COMMON USE FOR LAWFUL PURPOSES IN ORDER
           TO JUSTIFY THE BANS, WHICH IT HAS NOT AND CANNOT DO ........... 10

     C)    COURTS HAVE UNIFORMLY INVALIDATED STUN GUN BANS
           EVEN BEFORE BRUEN, BASED ON THE CORE SECOND
           AMENDMENT PRINCIPLES ESTABLISHED IN *HELLER* .......................... 12

IV)    CONCLUSION..................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) ............................. 17

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) .................................................... 7

*Avitabile v. Beach*, 368 F.Supp.3d 404 (N.D.N.Y. 2019) ...................................... 14-15

*Bryant v. Woodall*, 1 F.4th 280 (4th Cir. 2021) ........................................................... 7

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................. *passim*

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016) ............................................... 7

*Commonwealth v. Caetano*, 26 N.E.3d 688, 470 Mass. 774 (2015) ............................ 9

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................... *passim*

*Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299 (3d Cir. 2020) ....................... 16

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................. 17

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ............................... 11

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) .............................. 15

*Maloney v. Singas*, 351 F.Supp.3d 222 (E.D.N.Y. 2018) .......................................... 14

*Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978) ........... 8

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................... 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ............................... *passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................... 11

*O'Neil v. Neronha*, 594 F.Supp.3d 463 (D.R.I. 2022) ............................................... 15

*People v. Aguilar*, 2 N.E.3d 321, 2013 IL 112116 (2013) .......................................... 14

*People v. Baughan*, No. 276323, 2008 WL 2917635 (Mich. Ct. App. Jul. 29, 2008) ............... 12

*People v. Mosley*, 33 N.E.3d 137, 2015 IL 115872 (2015) ........................................ 14

*People v. Smelter*, 437 N.W.2d 341, 175 Mich.App. 153 (Ct. App. 1989) ................. 12

*People v. Webb*, 131 N.E.3d 93, 2019 IL 122951 (2019) ................................................ 14

*People v. Yanna*, 824 N.W.2d 241, 297 Mich.App. 137 (Ct. App. 2012) ......................... 1, 12-13

*Ramirez v. Commonwealth*, 94 N.E.3d 809, 479 Mass. 331 (2018) ........................................ 13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................................... 7

*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019) ...................................... 7

*Vitagliano v. County of Westchester*, 71 F.4th 130 (2d Cir. 2023) ......................................... 7

## <u>Statutes</u>

18 U.S.C. §922 ...................................................................................................................... 5

1976 N.Y. Laws ch. 217 ....................................................................................................... 3

1990 N.Y. Laws ch. 264 ....................................................................................................... 4

2018 Mass. Acts c. 123, §13; M.G.L. c. 140, §131J ........................................................... 13

28 U.S.C. §1865 ................................................................................................................... 5

42 U.S.C. §1983 ................................................................................................................... 8

*Id.* §265.02 ........................................................................................................................... 5

N.Y. Judiciary L. §510 ......................................................................................................... 5

N.Y. Penal L. §70.00 ........................................................................................................... 5

N.Y. Penal L. §70.15 ........................................................................................................... 5

N.Y. Penal L. §80.00 ........................................................................................................... 5

N.Y. Penal L. §80.05 ........................................................................................................... 5

N.Y. Penal L. §265.00 ....................................................................................................... 4-5

N.Y. Penal L. §265.01 ................................................................................................... *passim*

N.Y. Penal L. §265.02 ........................................................................................................... 5

N.Y. Penal L. §400.00 ........................................................................................................... 5

N.Y.C. Admin. Code §10-135 ........................................................................................ *passim*

N.Y.C. Local Law 38 of 1985 ............................................................................................... 3

R.I. Gen. L. §11-47-42.............................................................................................................. 2

## **Other Authorities**

Bill Jacket, 1976 N.Y. Laws ch. 217........................................................................................ 3

Bill Jacket, 1990 N.Y. Laws ch. 264........................................................................................ 4

*Defensive Use of Stun Guns Rises*, N.Y. Times (Apr. 28, 1985).................................................. 4

Eugene Volokh, *Nonlethal self-defense, (almost entirely) nonlethal weapons, and the rights to keep and bear arms and defend life*, 62 Stan.L.Rev. 199, 206 n.28, 212 (2009)............... 13

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (Jun. 18, 2023), available at https://ssrn.com/abstract=4483206 (last visited Feb. 27, 2024)............................................ 10

Timothy Cunningham, *A New and Complete Law Dictionary* (1771)........................................ 1

## **Rules**

Fed. R. Civ. P. 25 ...................................................................................................................... 8

## I)      INTRODUCTION

As a matter of plain text, the Second Amendment extends to "all instruments that constitute bearable arms," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022), i.e. "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (quoting 1 Timothy Cunningham, *A New and Complete Law Dictionary* (1771)). That includes "even those that were not in existence at the time of the founding." *Id.* at 582. As a matter of history, *Heller* and *Bruen* establish that the only exception to this broad protection of bearable arms is for arms that are "dangerous and unusual." However, if an arm is "in common use" then it is, by definition, not dangerous and *unusual*. In this case, that is dispositive of the total ban that the City and State of New York impose and enforce against stun guns and tasers.

Stun guns and tasers are personal weapons that use an electrical current to temporarily stun a person, which "are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring). Tasers differ from stun guns in that they project wires to also deliver the electrical stun from a distance, and while "Taser" is a trademark, the term also has a colloquial usage. *See generally People v. Yanna*, 824 N.W.2d 241, 243, 297 Mich.App. 137, 140 n.3 (Ct. App. 2012). "Electronic stun guns are no more exempt from the Second Amendment's protections, simply because they were unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment." *Caetano*, 577 U.S. at 417 (Alito, J., concurring) (citing *Heller*, 554 U.S. at 582). Thus, when the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns on the basis that they are "unusual" weapons because unanimously rejected that holding as "inconsistent with *Heller*." *Id.* at 412.

Following *Caetano*, courts in states with similar prohibitions on stun guns have rightly struck them down as unconstitutional under the Second Amendment. The City and State of New York stand alone with Rhode Island in continuing to ban the mere possession of these arms. N.Y. Penal L. §265.01(1); R.I. Gen. L. §11-47-42(a)(1); N.Y.C. Admin. Code §10-135(b). *Heller* and *Bruen* precisely determine the limits of the government's authority to enact "a 'complete prohibition'" on a type of arm in a manner "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 22, 24 (quoting *Heller*, 554 U.S. at 629). It can enact and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that its regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (quotations and citations omitted). Because the stun guns and tasers banned by the City and State of New York are "in common use at the time for lawful purposes," they cannot be "dangerous and unusual," *id.*; *see also id.* at 624, and therefore cannot be banned—full stop.

## II)   MATERIAL FACTS

### A)  The Challenged Statutes—New York Penal Law §265.01(1) and New York City Administrative Code §10-135—Broadly Prohibit the Possession of Stun Guns and Tasers

The New York Penal Law makes it a crime to possess either a stun gun ("electronic stun gun") or a "taser" ("electronic dart gun"), along with other weapons that are not at issue here:

> § 265.01 Criminal possession of a weapon in the fourth degree.
> A person is guilty of criminal possession of a weapon in the fourth degree when:
> (1) He or she possesses any firearm, *electronic dart gun*, *electronic stun gun*, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken, or "Kung Fu star"; . . .
> Criminal possession of a weapon in the fourth degree is a class A misdemeanor.

N.Y. Penal L. §265.01(1) (emphasis added). There are exceptions for (pertinently) police and the military, but none apply to ordinary people such as the Plaintiffs here. *See id.* §265.20(1)(a)-(d).

The State first prohibited tasers in 1976. *See* 1976 N.Y. Laws ch. 217. The Bill Jacket includes a memorandum and a letter from the bill's sponsor in the Senate, which both specifically identify the "Taser Public Defender" as an example of a to-be-prohibited "electronic dart gun." *See* Sponsor's Mem. & Ltr., Bill Jacket, 1976 N.Y. Laws ch. 217, at 4, 6; Ex. 6 to Dec. of David D. Jensen, Esq. ("Jensen Dec."). Both the memorandum and the letter acknowledge the taser "was designed as a self-defense weapon," but assert that tasers "already have been used for illegal purposes" such as "holdups and robberies." *See id.* The Bill Jacket also includes a letter from counsel for Taser Systems, Inc., which contends that "the Taser is not only non-lethal but is meaningfully less dangerous than any other self-defense weapon heretofore created." *Id.* at 15.

In 1985, the City of New York enacted its own local law that went further than the Penal Law by prohibiting all stun guns. *See* N.Y.C. Admin. Code §10-135; N.Y.C. Local Law 38 of 1985. The City's law provides:

> § 10-135 Prohibition on sale and possession of electronic stun guns.
> \* \* \*
> b. It shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any electronic stun gun.
> c. Violation of this section shall be a class A misdemeanor. . . .

N.Y.C. Admin. Code §10-135(b)-(c). The City's law provides exceptions for police and for commercial shipments destined outside the City, but again, none for private citizens such as the Plaintiffs here. *See id.* §10-135(d)-(e). Contemporary news accounts indicate that the impetus for the City's ban was a 1985 incident in which several Queens police officers allegedly used stun guns to torture suspects. At the time, stun guns were "gaining popularity among law-enforcement

officials and civilians who consider them a benign and effective method of self-defense," and New York City officials expressed the concern that "the current notoriety" around the Queens incident could "escalate the use of these things among the public." *See Defensive Use of Stun Guns Rises*, N.Y. Times (Apr. 28, 1985); Ex. 8 to Jensen Dec. Thus, "[w]hile New York City officials approve of the stun guns for official use, they are seeking to tighten the laws to prevent the public from buying the weapons." *Id.*

The State amended the statute to also include "electronic stun guns" in 1990. *See* 1990 N.Y. Laws ch. 264. The sponsor's memorandum from the Senate explained that stun guns "have shown up across the State in a variety of confrontational circumstances, such as experienced by police officers in domestic disputes," and the sponsor's memorandum from the Assembly cited a 1988 incident in which "a county worker shocked two female co-workers with an electrical stun gun." *See* Sponsor's Mem., Bill Jacket, 1990 N.Y. Laws ch. 264, at 7-8; Ex. 7 to Jensen Dec.

Both the Penal Law and the Administrative Code define the term "electronic stun gun" using essentially the same language, as "any device designed primarily as a weapon, the purpose of which is to stun . . . a person by passing" an electric "shock." Although the two definitions juxtapose some additional terms, these differences do not appear to be material. *See* N.Y. Penal L. §265.00(15-c) ("any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person"); N.Y.C. Admin. Code §10-135(a) ("any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person").

The Penal Law's definition of "electronic dart gun" (i.e. taser) also uses the same basic language referencing a "weapon" intended to "stun" by means of an electrical "shock," but it

requires further that the shock be "pass[ed] . . . by means of a dart or projectile." N.Y. Penal L. §265.00(15-a) ("any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile"). The City's "stun gun" definition excludes weapons that fall within this definition, limiting its definitional scope to "any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person." N.Y.C. Admin. Code §10-135(a).

A violation of either law—the Penal Law provision or the Administrative Code section—is a class A misdemeanor. *See* N.Y. Penal L. §265.01; N.Y.C. Admin. Code §10-135(c). Thus, the maximum punishment is imprisonment for up to 364 days and a fine of up to $1,000. N.Y. Penal L. §§70.15(1), 80.05(1). Notably, if a person "has previously been convicted of any crime," then the Penal Law provides the aggravated charge of Criminal Possession of a Weapon in the Third Degree, which is a class D felony. *Id.* §265.02(1). The maximum punishment for a class D felony is imprisonment for up to seven years and a fine of up to $5,000. *Id.* §§70.00(2)(d), 80.00(1)(a). Furthermore, a person so convicted would lose both the right to own firearms and the right to serve on juries. *See* 18 U.S.C. §922(g)(1); 28 U.S.C. §1865(b)(5); N.Y. Judiciary L. §510(3); N.Y. Penal L. §§265.01(4), 265.02(1), 400.00(1)(c).

**B) The Defendants Threaten to Enforce the Challenged Statutes Against the Plaintiffs**

Each of the five individual Plaintiffs in this case—Nunzio Calce, Allen Chan, Shaya Greenfield, Ray Pezzoli, and Amanda Kennedy—would like to purchase, possess, and carry a stun gun or a taser in the City of New York, but they refrain from doing so because they fear that NYPD officers will arrest or otherwise prosecute them if they do. Plaintiffs' LR 56.1 Statement ("Plfs' 56.1") at ¶¶ 6, 11, 16, 21, 28. Plaintiffs Calce, Chan, Greenfield and Pezzoli all live in

New York City, and at the outset of this case, each contacted their local NYPD precincts to ask whether stun guns and tasers are legal. *Id.* at ¶¶ 7, 12, 17, 22. NYPD officers told each of the Plaintiffs that stun guns and tasers are illegal. *Id.* Nothing has happened since then that would change their understanding that Defendants intend to enforce the laws at issue if they purchase, possess, or carry stun guns or tasers. *Id.* at ¶¶ 8, 13, 18, 23.

For her part, Plaintiff Kennedy did not even need to ask. In November 2021, NYPD officers charged her with violating §10-135 of the New York City Administrative Code, the City law at issue in this case, after she used a stun gun to protect herself from an irate woman who attacked her in Brooklyn. *Id.* at ¶¶ 29-31. Plaintiff Kennedy lives in Connecticut and she travels to the City on a regular basis but, in light of the previous criminal charge against her, she fears arrest and prosecution, and she thus refrains from possessing a taser or stun gun when she does so. *Id.* at ¶¶ 27-28, 34.

The Plaintiffs' fear is well grounded. During the year of 2023 alone, NYPD officers arrested 2,229 individuals for violating subpart (1) of Penal Law §265.01, the state law at issue here. *Id.* at ¶ 36. In 2022, the year prior, NYPD officers arrested 1,552 people, and in the year 2021, NYPD officers arrested 1,307, and in 2021, they arrested 1,307. *Id.* at ¶¶ 37-38. This subpart of Penal Law §265.01 prohibits the possession of 18 categories of items, of which stun guns and tasers are two, although Defendants do not maintain records from which they can determine how many of the arrests concerned stun guns or tasers, vis-à-vis metal knuckles or switchblade knives (for example). *Id.* at ¶ 39. New York City Administrative Code §10-135, on the other hand, proscribes only stun guns, and nothing else, but Defendants also do not maintain records from which they can determine how many people they charged with violating this

section. *Id.* at ¶ 40. Of course, there is little doubt that NYPD officers enforce this law, as they in fact enforced it against Plaintiff Kennedy. *Id.* at ¶¶ 30-31.

Moreover, Defendants have not disavowed the enforcement of any of the laws at issue. Far from disclaiming enforcement, the City of New York trains and instructs NYPD officers to enforce the statutory prohibitions on stun guns and tasers. The NYPD Police Student Guide identifies the "electronic dart gun" and "electronic stun gun" as being among the weapons for which "[n]o intent is required, so that the mere possession of [them] is a crime." *Id.* at ¶ 41. The Guide includes both stun guns and tasers in a separate section that lists and includes pictures of weapons that Article 265 of the Penal Law prohibits. *Id.* at ¶ 42.

Plaintiffs have standing to challenge the laws at issue so long as they show: "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'proscribed by' the challenged law; and (3) that 'there exists a credible threat of prosecution thereunder.'" *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotations and citation omitted)); *accord Antonyuk v. Chiumento*, 89 F.4th 271, 333 (2d Cir. 2023). Moreover, when a statute prohibits engaging in specified conduct, a court "'presume[s] such intent [to enforce the statute] in the absence of a disavowal by the government or another reason to conclude that no such intent existed.'" *Vitagliano*, 71 F.4th at 138 (quoting *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019) (internal quotations and citation omitted)); *accord Antonyuk*, 89 F.4th at 334. Indeed, "[c]ourts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quotation omitted); *see also Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021) ("[A] court presumes that a legislature

enacts a statute with the intent that it be enforced."). The Plaintiffs easily meet this standard: (1) they intend to possess stun guns and tasers; (2) the challenged statutes prohibit this conduct; and (3) Defendants have not disavowed enforcement.

The Defendant City is a "person" subject to liability under 42 U.S.C. §1983 for its own laws, policies, customs and practices, including its adoption of New York City Administrative Code §10-135 and the training and guidance it provides to its police officers. *See generally Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690 (1978). And, Defendant NYPD Police Commissioner Edward A. Caban is a "person" who is liable for causing "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" "under color of any statute, ordinance, regulation, custom, or usage." 42 U.S.C. §1983. Defendant Commissioner Caban threatens to enforce the challenged statutes against the Plaintiffs, and he could redress the injuries the Plaintiffs complain of by directing NYPD officers to no longer enforce the laws at issue.[1]

## III)   ARGUMENT

### A)        THE PLAIN TEXT OF THE SECOND AMENDMENT PRESUMPTIVELY PROTECTS THE TARGETED ARMS

The initial question is whether the "plain text" of the Second Amendment protects the right to acquire, possess, and use for lawful purposes the banned stun guns and tasers. *Bruen*, 597 U.S. at 17. Its explicit terms—promising that "the right of the people to keep and bear arms shall not be infringed," U.S. CONST. amend. II—"guarantee the individual right to possess and carry weapons," *Heller*, 554 at 592. From this premise alone, it is clear that laws flatly prohibiting the

---

[1]      Edward A. Caban is the current Commissioner of the New York City Police Department, while Dermot Shea was Commissioner when Plaintiffs commenced this action. Plfs. 56.1 ¶¶ 3-4. Because Plaintiffs sued Commissioner Shea in his official capacity, Rule 25 provides that his "successor is automatically substituted as a party." Fed. R. Civ. P. 25(d).

keeping and bearing of arms are invalid. Just as the Second Amendment precludes banning the possession of handguns, *see id.* at 635, it precludes the ban on stun guns at issue. As the Supreme Court precedent establishes, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Because the stun guns and tasers targeted under the bans at issue plainly qualify as "thing[s] that a man . . . takes into his hands, or useth in wrath to cast at or strike another," they comfortably fit within the Founding-Era definition of "arms." *Id.* at 581 (quotation omitted).

The Supreme Court's opinion in *Caetano* solidifies this conclusion. There, the Supreme Judicial Court of Massachusetts had ruled that stun guns were *not* protected "arms" on the basis that "they 'were not in common use at the time of the Second Amendment's enactment.'" *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (quoting *Commonwealth v. Caetano*, 26 N.E.3d 688, 693, 470 Mass. 774, 781 (2015)). The Supreme Court unanimously reversed. *Id.* at 412. The Court explained that the Massachusetts high court's conclusion was "inconsistent with *Heller*'s clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding." *Id.* at 412 (quoting *Heller*, 554 U.S. at 582). The Supreme Court further rejected the alternative rationale that Massachusetts could ban stun guns as " 'unusual' because they are " 'a thoroughly modern invention.' " *Id.* (quoting *Commonwealth v. Caetano*, 26 N.E.3d at 693-94; 470 Mass. at 781). The reasoning—"equating 'unusual' with 'in common use at the time of the Second Amendment's enactment'"—was circular, and ultimately "inconsistent with *Heller* for the same reason." *Id.* And in *Bruen*, the Court cited *Caetano* in reiterating that, while the "definition of 'arms' is fixed according to its historical understanding, the general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28 (citing *Caetano*, 577 U.S. at 411-12).

**B)**     **BECAUSE THE SECOND AMENDMENT PROTECTS THE TARGETED ARMS, THE GOVERNMENT MUST DEMONSTRATE THAT THEY ARE NOT IN COMMON USE FOR LAWFUL PURPOSES IN ORDER TO JUSTIFY THE BANS, WHICH IT HAS NOT AND CANNOT DO**

Being plainly protected by the text of the Second Amendment, the burden shifts to the government to "justify its regulation" of stun guns and tasers "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. This includes "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (Jun. 18, 2023), available at https://ssrn.com/abstract=4483206 (last visited Feb. 27, 2024). *Heller* leaves no doubt that these two categories of arms are the opposite sides of the same coin, as the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" was the Court's whole justification in the first place for interpreting the Second Amendment as protecting arms "in common use." *Heller*, 554 U.S. at 627. And the Court cannot have been clearer that these two categories of arms are mutually exclusive. Because "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring), an arm that is "in common use"—and hence not "unusual"—is protected by the Second Amendment and "may not be banned." *Id.* (Alito, J., concurring). Defendants in this case have failed to meet their burden and have identified no historical evidence that stun guns and tasers can be subjected to a complete ban. They have not established that stun guns and tasers are both "dangerous and unusual" or, more directly, not in common use. Plfs. 56.1 ¶ 43. Nor is there any other basis for so concluding.

*Bruen* emphasized that the types of arms that are not "'in common use at the time'" are "those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554

-10-

U.S. at 627). *Caetano* makes clear that a weapon is not "unusual" just because it is new or modern. *Caetano*, 577 U.S. at 412. Indeed, this has to be the rule. All technological development is "new" when first developed, and equating "new" with "unusual" would effectively freeze weapons technology in time—contravening the principle declared in *Heller* and reaffirmed in *Bruen* that the Second Amendment protects arms of modern origin.

The Second Circuit has described "common use" as "an objective and largely statistical inquiry." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255-56 (2d Cir. 2015). The consideration of typical possession assesses "both broad patterns of use and the subjective motives of . . . owners." *Id.* at 256. Specifically, the question is "whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians." *Id.* Thus, "a weapon's association with crime," standing alone, "is insufficient" to justify the conclusion that law-abiding individuals do not typically possess the weapon for lawful purposes. *See id.* Weapons in common use are, presumptively, "also typically possessed by law-abiding citizens for lawful purposes." *Id.* at 257 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1260-61 (D.C. Cir. 2011)).

The concurring opinion in *Caetano* in fact observed "stun guns are widely owned and accepted as a legitimate means of self-defense across the country," 577 U.S. at 420 (Alito, J., concurring)—a point which, again, Defendants have not and cannot meaningfully contest. If the government cannot make that showing because the arms at issue are in common use, while historical tradition may justify other types of restrictions on the who, how, when, and where of using the arms, it *does not justify a flat ban*, as a matter of binding Supreme Court precedent. Any further examination of history and tradition is not necessary or appropriate, because the

Supreme Court has already done the historical analysis, and its conclusions are binding. That is the end of the story.

C)   **COURTS HAVE UNIFORMLY INVALIDATED STUN GUN BANS EVEN BEFORE *BRUEN*, BASED ON THE CORE SECOND AMENDMENT PRINCIPLES ESTABLISHED IN *HELLER***

While the fate of the challenged laws is clear enough based on the foregoing analysis, it is worth noting the chorus of courts—at least three state appellate courts and two United States District Courts—that have struck down stun gun bans based on *Heller* alone. Although all of these courts reached the same result, the state courts did so by reasoning that categorical bans on possession and use are incompatible with the constitutional right—in the same basic manner set forth above—while the two District Courts did so even using an "intermediate scrutiny" approach that the Supreme Court has since rejected in *Bruen*. Now that *Bruen* has unmistakably taken such interest-balancing off the table, it is even that much clearer that a flat ban on this category of arms cannot stand.

In fact, a Michigan appellate court invalidated a statute that made it a felony to "sell, offer for sale, or possess" a stun gun or taser even before the Supreme Court decided *Caetano*. *See People v. Yanna*, 824 N.W.2d 241, 297 Mich.App. 137 (Ct. App. 2012).[2] Yet, it was clear enough under *Heller* alone that stun guns and tasers were protected "arms" because they "may be used both for defense or 'to cast at or strike another,'" *id.* at 244; 297 Mich.App. at 143 (quoting *Heller*, 554 U.S. at 581 (internal citation omitted)), and because the government had "fail[ed] to

---

[2] This statutory prohibition applied to "a portable device or weapon from which an electrical current, impulse, wave, or beam may be directed, which current, impulse, wave, or beam is designed to incapacitate temporarily, injure, or kill." Mich. Comp. L. 250.224a(1). Michigan courts interpreted this language to include both stun guns and tasers. *See Yanna*, 824 N.W.2d at 242, 297 Mich.App. at 139; *People v. Smelter*, 437 N.W.2d 341, 342, 175 Mich.App. 153, 154-55 (Ct. App. 1989); *People v. Baughan*, No. 276323, 2008 WL 2917635, *3 (Mich. Ct. App. Jul. 29, 2008).

put forth evidence that would give the Court reason to doubt that the vast majority of Tasers and stun guns are possessed by law-abiding citizens for lawful purposes," *id.* at 245, 297 Mich.App. at 144. In this context, the court observed that, according to secondary sources, "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens, with many more in use by law enforcement officers." *Id.* (citing Eugene Volokh, *Nonlethal self-defense, (almost entirely) nonlethal weapons, and the rights to keep and bear arms and defend life*, 62 Stan.L.Rev. 199, 206 n.28, 212 (2009)). Thus, the conclusion was straightforward: "*Heller* held unconstitutional a law that completely banned the possession of protected arms in the home. We therefore hold that a complete ban on Tasers and stun guns in the home violates the Second Amendment." *Id.* at 246, 297 Mich.App. at 145-46 (citing *Heller*, 554 U.S. at 628–629).

The case of *Ramirez v. Commonwealth*, 94 N.E.3d 809, 479 Mass. 331 (2018), resolved the constitutionality of the Massachusetts ban at issue in *Caetano*.[3] After quoting the Supreme Court's rationale for overturning its prior ruling that stun guns were not protected, the Supreme Judicial Court of Massachusetts summarily "conclude[d] that stun guns are 'arms' within the protection of the Second Amendment." *See id.* at 814-15; 479 Mass. at 336-37 (citing *Caetano*, 577 U.S. at 411-12). From there, the law's fate was clear, and the court swiftly went on to hold "under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Id.* at 815; 479 Mass. at 337. The legislature thereafter amended the statute to allow for regulated possession and use of such arms. 2018 Mass. Acts c. 123, §13; M.G.L. c. 140, §131J.

The Supreme Court of Illinois similarly made short work of a state-level ban against carrying tasers and stun guns in public, in *People v. Webb*, 131 N.E.3d 93, 2019 IL 122951

---

[3] The parties in *Caetano* "resolved" the case after the Supreme Court's reversal and remand. *See Ramirez v. Commonwealth*, 94 N.E.3d 809, 811, 479 Mass. 331, 332 (2018).

(2019). The *Webb* court declared that "[a]ny attempt by the State to rebut the prima facie presumption of second amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *Webb*, 131 N.E.3d at 96, 2019 IL 122951 at ¶¶ 10, 13 (citing *Caetano*, 577 U.S. at 411). And, because the challenged law ""constitutes a categorical ban on those weapons," "that provision necessarily cannot stand." *Id.* at 98, 2019 IL 122951 at ¶ 21 (citing *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012); *People v. Mosley*, 33 N.E.3d 137, 2015 IL 115872 (2015); *People v. Aguilar*, 2 N.E.3d 321, 2013 IL 112116 (2013)). The statute was "facially unconstitutional under the second amendment." *Id.*

The federal district court case of *Avitabile v. Beach*, 368 F.Supp.3d 404, 410-12 (N.D.N.Y. 2019), actually concerned the same Penal Law provision at issue here. There, the court observed, correctly, that there is "a rebuttable presumption that 'the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms, 'not just to a small subset.'" *Id.* at 410 (quoting *Maloney v. Singas*, 351 F.Supp.3d 222, 232 (E.D.N.Y. 2018) (internal quotation omitted)). While the court also observed "the difficulty of meaningfully evaluating 'common use,'" it noted data from the plaintiffs showing that at least 300,000 tasers and about 4.5 million stun guns were in private hands in the country and that there was "no meaningful contrary evidentiary showing by the State, which ultimately 'bears the burden of rebutting the prima facie presumption of Second Amendment protection that extends to all bearable arms.'" *Id.* at 410-12 (quoting *Maloney*, 351 F.Supp.3d at 233 (internal quotation omitted)). Further, "the State ha[d] not offered a basis on which to rebut the presumption that tasers and stun guns, which are in common use, are typically possessed by law-abiding citizens for lawful purposes, such as self-defense." *Id.*

Similarly, in *O'Neil v. Neronha*, 594 F.Supp.3d 463 (D.R.I. 2022), which addressed a Rhode Island stun gun ban, the court noted that "the evidence in the record relating to typical use or possession is quite limited." *Id.* at 473. While crediting data from the plaintiffs indicating sales of around 6.5 million stun guns during recent years, the court found that what really mattered was that "it is [the government's] burden to demonstrate that stun guns are not used for lawful purposes such as self-defense, and they failed to do so." *Id.*

Both the *Avitabile* and *O'Neil* courts proceeded to apply an (improper) intermediate scrutiny approach that considered whether the law was "substantially related to an important governmental objective." *Avitabile*, 368 F.Supp.3d at 418; *O'Neil*, 594 F.Supp.3d at 477. Even then, these courts only applied intermediate scrutiny "out of an abundance of caution," *Avitabile*, 368 F.Supp.3d at 418, and still observed that the law "d[id] not survive even the less rigorous level of intermediate scrutiny," *O'Neil*, 594 F.Supp.3d at 477. They both went on to conclude that the cited governmental interests did not justify a complete categorical ban on stun guns and tasers. *Avitabile*, 368 F.Supp.3d at 420-21 (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012)) ("[A] mere generalized appeal to public safety and crime prevention as the justification for a total and complete ban on a whole class of arms is precisely the kind of 'shoddy reasoning' that even intermediate scrutiny forbids."); *O'Neil*, 594 F.Supp.3d at 478 (a "total ban . . . clearly lacks the required 'substantial' fit between the asserted governmental interest and the means chosen to advance those interests, and accordingly, violates the Second Amendment").

Of course, the Supreme Court has since explicitly rejected any tiered scrutiny approach in evaluating the constitutionality of arms regulations—and in particular the use of "intermediate scrutiny." *Bruen*, 597 U.S. at 19-24. In rejecting such tests, *Bruen* made *Heller*'s text-and-history

standard explicit—the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. This standard requires the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. *Bruen* both elaborated upon *Heller*'s text-and-history approach and, most significantly for purposes of this categorical weapons ban case, reaffirmed that law-abiding citizens have an absolute right to possess arms that are in common use. Again, the only arms that constitutionally may be banned are only those that are both dangerous *and* unusual. *Bruen*, 597 U.S. at 21. Arms in common use for lawful purposes, like the stun guns and tasers that Defendants target here, by definition, are neither.

## IV)   CONCLUSION

*Heller* and *Bruen* speak with one voice, and they speak clearly here: when the government enacts a prohibition on arms, the only way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 597 U.S. at 17, 21 (quoting *Heller*, 597 U.S. 627) (other citation and quotation omitted). If the government cannot make that showing because the arms at issue are in common use, any further examination of history and tradition is not necessary or appropriate, because the Supreme Court has already done the historical analysis, and its conclusions are binding. *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 308 n.8 (3d Cir. 2020).

The stun gun and taser bans set forth in the Administrative Code and the Penal Law conflict directly with the Second Amendment's guarantee protecting the people's right to keep

and bear arms for their protection. A deprivation of Second Amendment rights is an injury that, by its very nature, is irreparable. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Just the same, the balance of equities and the public interest weigh heavily in favor of an injunction because "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004). As such, the Court should enjoin Defendants from enforcing N.Y.C. Admin. Code §10-135, as well as from enforcing N.Y. Penal L. §265.01(1) against "electronic dart guns" and "electronic stun guns."

Dated:  New York, New York
         March 1, 2024

DAVID JENSEN PLLC

By: _____
        David D. Jensen, Esq.