UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

NUNZIO CALCE, ALLEN CHAN; SHAYA
GREENFIELD; AMANDA KENNEDY; RAYMOND
PEZZOLI; SECOND AMENDMENT FOUNDATION; and
FIREARM POLICY COALITION, INC.,

                                                         Plaintiffs,

                     -against-

CITY OF NEW YORK; and DERMOT SHEA, in his official
capacity as Commissioner of the New York City Police
Department,[1]

                                                         Defendants.

**DECLARATION OF ARTUR EDWARD SADOWSKI**

21-CV-08208 (ER)

---------------------------------------------------------------------------X

       **ARTUR EDWARD SADOWSKI**, declares under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct:

       1.      I am an Axon Taser Master Instructor and a Training Coordinator at the New York City Police Department ("NYPD"). I have been employed by the NYPD since January 2005 and have served as a Stun Device Curriculum Developer since 2017. My responsibilities include writing and editing lesson plans on stun devices and conducting instructor development for the proper use of stun devices. I have been the primary author of the lesson plans used by the NYPD for stun devices since 2020.

       2.      The statements made in this declaration are based on my personal knowledge, review of records maintained by the NYPD and the City of New York, communications with NYPD staff, and upon statements made by employees, officers, and agents of the City of New York.

---

[1] Edward Caban is current the Commissioner of the NYPD.

3. I submit this declaration in opposition to plaintiffs' motion for summary judgment and in support of defendants' cross-motion for summary judgment. More specifically, this declaration will address how electronic dart guns and electronic stun guns operate, the extensive trainings conducted by the NYPD on the use of these devices, and the dangerousness of these weapons.

**Electronic Stun Guns and Electronic Dart Guns (aka Tasers)**

4. An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." See Exhibit A. Stun guns require direct contact between the device and an individual.

5. An electronic dart gun is defined as "any device designed primarily as a weapon" the purpose of which is to stun, knock out or paralyze a person "by passing an electrical current to such person by means of a dart or projectile." See Exhibit A. Electronic dart guns, or "Tasers" as they are commonly known, can be utilized as direct contact devices or as ranged weapons.[2]

6. An electronic dart gun incapacitates individuals by transmitting pulses of electric current. It fires two small darts, connected to the gun with wires. The electric shock disrupts the body's motor nervous system which results in temporary incapacitation.

7. When properly used, Tasers are considered to be "less lethal options" to firearms, which is why they are an effective tool for law enforcement. However, there are

---

[2] Taser is a brand name of an electronic stun/dart gun. All Tasers are electronic dart/stun guns, but technically not all electronic dart/stun guns are Tasers. It is used in this report in the colloquial sense unless referring specifically to NYPD stun guns/devices, all of which are the brand "Taser."

portions of the population that are more susceptible to a serious injury when Tasers are used against them such as those individuals who are already medically compromised due to, for example, heart disease, asthma, or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug or alcohol intoxication, or chronic drug abuse. The use of a stun device on any of these vulnerable groups can result in serious injury, including death.

8.   A majority of injuries incurred by Tasers are not from the device itself, but are generally related to secondary causes. For example, the device may cause painful muscle contractions that lead to a loss of balance, and that loss of balance may lead to a fall-related injury (such as a head hitting a hard surface). Injuries more likely to be caused by the Taser device itself are muscle strains and soreness, and temporary soft tissue damage at probe or electrode impact sites. Though the occurrence of deaths in incidents where stun devices are used is rare, they do occur.

9.   Moreover, additional safety concerns arise when civilians purchase stun devices on the internet or in their local New York City convenience store where they are sometimes offered for sale. The NYPD ensures that the tasers used by officers are only purchased from reputable companies. This guarantees a certain level of product testing and quality-control.  Stun devices sold over the internet or in a corner store may not have the same level of product safety requirements which could lead to more misuse, serious injuries and even fatalities. Additionally, an individual using a Taser recreationally or during a crime may be unaware of manufacturer guidelines for proper product use, or purposefully ignore them, thus creating a greater risk to public safety.

**Required Trainings within the NYPD**

10. To lessen the occurrence of unnecessary injury, NYPD officers are required to participate in extensive trainings on the use of stun devices. The NYPD requires officers to be recertified in these devices annually.

11. During these trainings, officers are instructed on production specifications of the physical weapon itself as well as overall safety parameters. Namely, officers are trained on how to properly operate these devices including how to load and unload the device, proper probe placement, team tactics, and how to determine what is considered to be a "preferred target area." Officers are taught to aim below the bottom of the chest cavity to keep the probe further from the heart (as well as further from throat and face for frontal deployments). Additionally, officers are encouraged to keep the total number of cumulative discharges (five second cycles), at less than three.

12. Officers are further trained to quickly recognize high risk populations (see paragraph 7 above) to determine whether use of a taser would have a particularly adverse effect in a certain situation. Such high risk populations include medically compromised individuals and people suffering from certain emotional disorders such as excited delirium, profound agitation, severe exhaustion, drug or alcohol intoxication, and chronic drug use.

13. Once these extensive trainings are completed, officers must pass a written test and a practical test. During the practical test, an officer must: (1) deploy a total of 2 cartridges (X26P) or (4 Cartridges (Taser 7 – 2 stand off and 2 close quarters)) into preferred areas of a target, (2) demonstrate safe handling during loading and unloading of the device, (3) demonstrate proper finger positioning, aiming, and deploying at preferred target areas, and (4) perform a proper de-escalation warning arc (showing the arcing of electrical current at the front

of the Taser in the hopes that an individual will comply with commands to avoid the Taser being used), and (5) utilize the arc switch to re-energize deployed probes (Taser 7).

14. It is imperative that officers receive training on these complex devices to lessen the occurrence of serious injuries and fatalities. To that end, concerns regarding improper use of stun devices is only magnified when these weapons are put into the hands of untrained individuals. Individuals without such proper training may not understand where to aim the device to avoid fatal occurrences or the need to limit repeated discharges. Accordingly, left in untrained hands, the device may not be used as intended or may be used in a cruel or torturous manner.

Dated: New York, New York
April 26, 2024

_____
**ARTUR EDWARD SADOWSKI**