UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NUNZIO CALCE; ALLEN CHAN; SHAYA
GREENFIELD; RAYMOND PEZZOLI; SECOND
AMENDMENT FOUNDATION; FIREARMS
POLICY COALITION, INC.,

                  Plaintiffs,

       *v.*

THE CITY OF NEW YORK and DERMOT SHEA
as the Commissioner of the New York City Police
Department,

                Defendants.

21-CV-8208 (ER)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**


HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the
  City of New York
Attorney for Defendants
100 Church Street
New York, NY 10007
Tel: (212) 356-2183


Michelle Goldberg-Cahn
Nicholas Ciappetta
Samantha Schonfeld
   *of Counsel*


April 26, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ii

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT FACTS ................................................................................................. 2

      A.  The Challenged Laws ................................................................... 2

      B.  The History of Stun Guns and Tasers ....................................... 4

      C.  Historical Regulation of Other Non-Firearm Weapons ................................................................................................. 5

LEGAL STANDARD ............................................................................................... 5

ARGUMENT ............................................................................................................ 6

      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIM ............................................................................ 6

      A.  Governing Legal Principles ......................................................... 6

      B.  Bruen Step 1: Plaintiffs Fail to Demonstrate that Stun Guns and Tasers are Constitutionally Protected by the Second Amendment. ............................. 7

          i.    The Burden to Demonstrate that Stun Guns and Tasers are in Common Use Rests with Plaintiffs ....................................................... 8

          ii.   Plaintiffs Fail to Demonstrate that Stun Guns and Tasers are in Common Use for Self-Defense in the United States ................................10

          iii.  Defendants Establish that Unfettered Access to Stun Guns and Tasers in New York City is Dangerous ............................................13

      C.  Bruen Step 2: The City has Demonstrated that the Regulation of Stun Guns and Tasers is Consistent with the Historical Tradition of the Regulation of Non-Firearm Weapons in the United States ..................................................................................15

**Page**

     i.     The History of Stun Guns and Tasers ........................................16

     ii.    The Historical Regulations of Non-Firearm Weapons are Relevantly Similar to New York City's Regulations of Stun Guns and Tasers ..........................................................18

          a.    Bowie knives .................................................. 18

          b.    Clubs and other Blunt Weapons ....................... 20

          c.    Toy Guns ........................................................ 21

    iii.   Historical Analysis Suggests that Penal Law Section 265.01 and Administrative Code Section 10-135 are Constitutional and Should be Upheld ..........................................21

CONCLUSION ........................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**                                               **Pages**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..............................................................................5

Antonyuk v. Chiumento,
    89 F.4th 271 (2d. Cir. 2023) ............................................................15

Avitable v. Beach,
    368 F. Supp. 3d 404 (N.D.N.Y. 2019)........................................12, 14

Aymette v. State,
    21 Tenn. 152 (Tenn. 1840) ..........................................................18, 19

Boland v. Bonta,
    No. 22-cv-01421, 2023 U.S. Dist. LEXIS 51031
    (C.D. Cal. Mar. 20, 2023) ..................................................................9

Caetano v. Massachusetts,
    577 U.S. 411 (2016)....................................................................11, 12

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)............................................................................5

Cockrum v. State,
    24 Tex. 394 (1859).................................................................19, 20, 21

Def. Distributed v. Bonta,
    No. 22-cv-6200, 2022 U.S. Dist. LEXIS 195839
    (C.D. Cal. Oct. 21, 2002) ...................................................................9

District of Columbia v. Heller,
    554 U.S. 570 (2008)...........................................................6, 10, 11, 12

Haynes v. Tennessee,
    24 Tenn. 120 (1844).........................................................................19

Jones v. Bermudez,
    No. 15-cv-8527 (PKC)(BCM), 2019 U.S. Dist. LEXIS 25371
    (S.D.N.Y. Feb. 14, 2019)..................................................................10

Kennedy v. Bermerton Sch. Dist.,
    142 S. Ct. 2407 (2002)......................................................................10

**Cases**                                                                                                              **Pages**

Lane v. Rocah,
    No. 22-cv-10989(KMK), 2024 U.S. Dist. LEXIS 1839
    (S.D.N.Y. Jan. 4, 2024)...........................................................................................................8

McDonald v. Chicago,
    561 US. 742 (2010)..............................................................................................................6

Mintz v. Chiumento,
    No. 23-cv-795, 2024 U.S. Dist. LEXIS 61699 (N.D.N.Y. Mar. 20, 2024) ........................8, 15

N.A. for Gun Rights, Inc. v. City of San Jose,
    No. 22-cv-00501, 2023 U.S. Dist. LEXIS 120797
    (N.D. Ca. July 13, 2023) ......................................................................................................9

N.Y. State Rifle & Pistol Association v. Cuomo,
    804 F.3d 242 (2d Cir. 2015)...............................................................................................10

New York State Rifle & Pistol Ass'n v. Bruen,
    142 S. Ct. 2111 (2022)............................................1, 6, 7, 8, 9, 10, 12, 13, 14, 15, 22

New York State Rifle & Pistol Ass'n v. Bruen,
    597 U.S. 1 (2022)...................................................1, 7, 12, 14, 15, 16, 17, 18, 19, 23

O'Neil v. Neronha,
    594 F. Supp. 3d 463 (D. RI. Mar. 15, 2022) ........................................................................8, 10

Oregon Firearms Fed'n, Inc. v. Brown,
    644 F. Supp. 3d 782 (D. Or. 2022) .......................................................................................9

Palumbo v. Provident Trust Grp. LLC, 6:19-cv-0252 (LEK/ATB),
    2021 U.S. Dist. LEXIS 53882, *6-7 (N.D.N.Y. Mar. 23, 2021)
    (quoting Anderson, 477 U.S. at 248). ..................................................................................5, 6

Rocky Mountain Gun Owners v. Polis,
    No. 23-cv-01077, 2023 U.S. Dist. LEXIS 137087 (D. Colo. Aug. 7, 2023)............................9

Rupp v. Bonta,
    8:17-cv-00746-JLS-JDE, 2024 U.S. Dist. LEXIS 46430
    (C.D. Ca. Mar. 15, 2024) .....................................................................................................8, 10, 13

United States v. Alston,
    No. 22-cr-178, 2023 U.S. Dist. LEXIS (E.D.N.Y. Oct. 23, 2023) ...........................................9

United States v. Berger,
    No. 5:22-cr-00033, 2024 U.S. Dist. LEXIS 20259 (E.D. Pa. Feb. 5, 2024).......................8, 10

**Cases**                                                                                                    **Pages**

United States v. Brady,
    No. 22-cr-47, 2023 U.S. Dist. LEXIS 203521 (N.D. Ind. Nov. 12, 2023) ................................9

United States v. Deryke,
    No. 23-cr-92, 2023 U.S. Dist. LEXIS 193043 (W.D. Mich. Oct. 27, 2023) ............................9

**Statutes**

Fed. R. Civ. P. 5.1 ........................................................................................................................6

Fed. R. Civ. P. 12(b)(1)................................................................................................................2

Fed. R. Civ. P. 12(b)(6)................................................................................................................2

Fed. R. Civ. P. 56(a) ....................................................................................................................5

Local Rule 56.1 ............................................................................................................................2

New York City Administrative Code Section 10-135 ....................................1, 2, 3, 15, 21, 22, 23

Penal Law § 265.01......................................................................................1, 2, 3, 15, 21, 22

## PRELIMINARY STATEMENT

Plaintiffs filed this federal lawsuit against the City of New York ("City") to invalidate certain laws that ban the possession, use, and sale of electronic stun guns and electric dart guns (commonly known as "tasers") [1] in the City and State of New York.

Plaintiffs assert that the bans set forth in Section 265.01 of the New York State Penal Law ("Penal Law") and Section 10-135 of the New York City Administrative Code ("Administrative Code") violate their Second Amendment right to keep and bear arms. Specifically, plaintiffs claim that stun guns and tasers are subject to Second Amendment protection because their use satisfies the two-step analytical framework set forth in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). To support their position, plaintiffs argue that stun guns and tasers are in "common use" across the United States for purposes of self-defense, and are therefore not dangerous or unusual. To that end, plaintiffs seek a declaration that Penal Law § 265.01 and Administrative Code § 10-135 are unconstitutional. See Amended Complaint ("Compl." or "Am. Compl."), Wherefore Clause.

Plaintiffs' Second Amendment claim fails at the outset as plaintiffs cannot satisfy step 1 of the Bruen analysis. Notwithstanding that plaintiffs incorrectly assert that step 1 is defendants' burden to bear, plaintiffs provide no evidence whatsoever that the proposed conduct is covered by the plain text of the Second Amendment. Tellingly, plaintiffs' motion papers are utterly lacking any statistics or data showing that stun guns and tasers are in common use in the United States (let alone New York City) for self-defense. Plaintiffs' blatant failure to meet their

---

[1] TASER is an acronym for "Tom Swift and His Electric Rifle" and is the brand name of electronic dart guns developed by Jack Cover in the 1960s and 1970s. See Declaration of Samantha Schonfeld, dated April 26, 2024 ("Schonfeld Dec.") Ex. B at 5-6, n. 5.

burden is fatal to their Second Amendment claim—so fatal that the court can simply end its analysis here.

Assuming arguendo, that plaintiffs have demonstrated that stun guns and tasers are in common use for self-defense and therefore covered by the plain text of the Second Amendment, defendants must then establish that the current regulation of stun guns and tasers is consistent with the United States' "historical tradition" of the regulation of other non-firearm weapons. Defendants satisfy this burden with no problem. From their inception in the 1930s and 1960s through the present day, stun guns and tasers have followed relevantly similar regulatory trajectories as those of other non-firearm weapons including Bowie knives, toy guns, and several types of clubs. Indeed, each of these weapons begin in a production phase—many times for purposes of law enforcement or military use and not self-defense. Over time, these weapons made their way into public circulation. Once in civil society, these weapons were increasingly used to commit crimes, thus creating an impetus for the enactment of a regulatory scheme. As these historical weapons restrictions are "remarkably analogous to contemporary restrictions on stun guns and tasers," defendants have successfully demonstrated that Penal Law § 265.01 and Administrative Code § 10-135 pass constitutional muster. See Schonfeld Dec., Ex. B at 10.

For all of these reasons, plaintiffs' motion for summary judgment should be denied and defendants' cross-motion for summary judgment should be granted in its entirety.

## RELEVANT FACTS

### A.      The Challenged Laws

In this federal action, plaintiffs challenge certain provisions of the Penal Law and Administrative Code that ban the possession, use, and sale of stun guns and tasers in New York State and New York City. See Defendants' Local Rule 56.1 Statement, dated April 26, 2024 ("Defendants' Stmt.") ¶ 13.

2

Penal Law § 265.01 was adopted by New York State in 1974. Defendants' Stmt.

¶ 14.  Penal Law § 265.01 provides, in part:

> Section 265.01—Criminal Possession of a weapon in the fourth degree
>
> A person is guilty of criminal possession of a weapon in the fourth degree when:
>
> > (1)     He or she possesses any firearm, electric dart gun, electric stun gun, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sandbag, sandclub, wrist-brace type slingshot or slungshot, shirken, or "Kung Fu star"…

Criminal possession of a weapon in the fourth degree is a Class A misdemeanor.

<u>See</u> Defendants' Stmt. ¶ 15.

Plaintiffs further challenge Administrative Code § 10-135, which was adopted by New York City in 1985. <u>See</u> Defendants' Stmt. ¶ 17. Administrative Code § 10-135 provides, in part:

> § 10-135 Prohibition on sale and possession of electronic stun guns
>
> > a.  As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in § 265.00 of the penal law.
> >
> > b.  it shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any electronic stun gun.
> >
> > c.  Violation of this section shall be a Class A misdemeanor…

<u>See</u> Defendants' Stmt. ¶ 16.

3

B.       **The History of Stun Guns and Tasers**

Stun guns and tasers were not developed until the 1930s and 1960s respectively, making them modern inventions when compared to most firearms. Stun guns are devices that use an electric shock "to stun, cause mental disorientation, render unconscious or paralyze a person." Defendants' Stmt. ¶ 18. Although originally created in the 1930s for purposes of farming, stun guns were later adapted for use in riot control during the 1950s and 1960s. Schonfeld Dec., Ex. B at 5.

Electronic dart guns (or tasers) are devices that are "designed primarily as a weapon" to stun, knock out or paralyze a person "by passing an electrical current to such person by means of a dart or projectile." Defendants' Stmt. ¶ 20. The device fires electric darts or projectiles attached to wires. Id. ¶ 22. Tasers were originally created in the 1960s and 1970s for use by law enforcement. Id. ¶ 23; Schonfeld Dec., Ex. B at 5-6. Today, "over 90% of law enforcement agencies are equipped with [tasers]." Schonfeld Dec., Ex. B at 6.

Tasers were developed primarily to provide law enforcement and military personnel with a non-lethal alternative to firearms. Defendants' Stmt. ¶ 23.  However, since their inception, the use of stun guns and tasers have proved to be dangerous and many times fatal. For example, between 2010 and 2021, "at least 513 individuals have died in the U.S. as the result of being fired upon with tasers by police." Defendants' Stmt. ¶ 30; Schonfeld Dec., Ex. B at 7. Similarly, between 2000 and 2020, "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." Defendants' Stmt. ¶ 31; Schonfeld Dec., Ex. B at 7-8.

Additionally, over the years both tasers and stun guns have developed widespread criminal appeal. These weapons have "gained popularity among robbers who use the devices to intimidate victims into cooperation." Schonfeld Dec., Ex. B at 8. These weapons have been further used "by criminals to intimidate and even torture victims." Defendants' Stmt. ¶ 29.

Due to their increased criminal appeal, states began enacting laws restricting the use and possession of stun guns and tasers. Between 1970 and the early 2000s, several states, including New York, enacted laws banning civilian possession of stun guns and tasers. Defendants' Stmt. ¶ 24; Schonfeld Dec., Ex. B at 6. Approximately 40 localities within 15 states enacted similar restrictions on the banning of civilian possession of stun guns and tasers. Defendants' Stmt. ¶ 25. Approximately 17 states and "nearly 130 localities" imposed carry bans on stun guns and tasers. Defendants' Stmt. ¶ 26.

C.      **Historical Regulation of Other Non-Firearm Weapons**

Throughout the Nation's history, non-firearm weapons were subject to significant, widespread, and varied regulation. As set forth in more detail below, since the 1700s, regulations were enacted to restrict the use of Bowie knives, clubs, certain blunt objects, and toy guns in ways similar to the ways tasers and stun guns are currently regulated. See Schonfeld Dec., Ex. B at 10-26; Defendants' Stmt. ¶¶ 32-43.   These restrictions varied from bans on the concealed and open carry of these weapons to overall bans on their sale. See Schonfeld Dec., Ex. B at 10-26.

## LEGAL STANDARD

A party is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Material" facts are facts that "might affect the outcome of the suit under the governing law," Anderson, 477 U.S. at 248, and a "genuine" dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Palumbo v. Provident Trust Grp. LLC,

6:19-cv-0252 (LEK/ATB), 2021 U.S. Dist. LEXIS 53882, *6-7 (N.D.N.Y. Mar. 23, 2021) (quoting Anderson, 477 U.S. at 248). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Palumbo, 2021 U.S. Dist. LEXIS 53882, at *7. As detailed below, defendants have satisfied the summary judgment standard as to all claims and, thus, the Amended Complaint should be dismissed in its entirety. In contrast, plaintiffs have not carried their burden as they offer no evidence to survive the first step of the Bruen analysis, and their motion for summary judgment must be denied.[2]

## ARGUMENT

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIM

**A.     Governing Legal Principles**

The Supreme Court's decisions in District of Columbia v. Heller, 554 U.S. 570 (2008), McDonald v. Chicago, 561 US. 742 (2010), and Bruen, collectively establish that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home and carry a handgun in public for purposes of self-defense. While these decisions reshaped the landscape of Second Amendment jurisprudence, their actual holdings were narrow in scope.  Indeed, the Second Amendment, like other constitutional rights, is not unlimited.  See Heller, 554 U.S. at 626.  It is not a right to "keep and carry any weapon

---

[2] Plaintiffs also fail to comport with the requirements of the Federal Rules of Civil Procedure ("FRCP") Rule 5.1.  Rule 5.1 mandates that a party filing a challenge to the constitutionality of a state statute file a notice of constitutional question and serve that notice upon the state Attorney General. Id.  Nowhere on the docket have plaintiffs filed a notice of constitutional question nor have they asserted in their complaint or motion papers that they filed such notice.

whatsoever in any manner whatsoever and for whatever purpose." <u>Id.</u>  Indeed, the Supreme Court has recognized certain laws that are presumptively valid and stated that the right to keep and carry arms is limited to those "in common use." <u>Bruen</u>, 597 U.S. at 47.

The Court in <u>Bruen</u> dispensed with the two-part means-end scrutiny (whether intermediate or strict scrutiny) applied by many of the federal circuits, and clarified that the Second Amendment "demands a test rooted in the Second Amendment's text, as informed by history." <u>Bruen</u>, 597 U.S. at 19.  The new test formulated by the Court is as follows:  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." <u>Id.</u> at 2129-30 (internal quotation marks and citations omitted).

**B.**   <u>**Bruen**</u> **Step 1: Plaintiffs Fail to Demonstrate that Stun Guns and Tasers are Constitutionally Protected by the Second Amendment.**

The <u>Bruen</u> test set forth above is a textual and historical one. "Step one … demands a test rooted in the Second Amendment's text…." 597 U.S. at 18. At step one, the reviewing court must determine "whether the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct…." <u>Id.</u> at 31.  If the answer to this question is in the affirmative, then the court will turn to the historical inquiry.  In other words, if the plain text of the Second Amendment does not demonstrate that the proposed conduct is constitutionally protected, then the analysis ends, and the government is not required to engage in a historical inquiry (step two) to show that the challenged law/rule is consistent with our country's tradition of weapons regulation.

In this context, <u>Bruen</u> step 1 "requires a textual analysis" determining whether "the weapon at issue is 'in common use' today for self-defense," and whether it is dangerous and unusual. <u>United States v. Berger</u>, No. 5:22-cr-00033, 2024 U.S. Dist. LEXIS 20259, at *8-9 (E.D. Pa. Feb. 5, 2024) ("following <u>Bruen</u>, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis.");[3] <u>Mintz v. Chiumento</u>, No. 23-cv-795 (MAD/CFH), 2024 U.S. Dist. LEXIS 61699 (N.D.N.Y. Mar. 20, 2024); <u>Lane v. Rocah</u>, No. 22-cv-10989(KMK), 2024 U.S. Dist. LEXIS 1839, at *18 (S.D.N.Y. Jan. 4, 2024) ("the Supreme Court has held that the Second Amendment protects the sorts of weapons that are in common use for lawful purposes for self-defense.")(internal citations and quotations omitted); <u>Rupp v. Bonta</u>, 8:17-cv-00746-JLS-JDE, 2024 U.S. Dist. LEXIS 46430, at *23 (C.D. Ca. Mar. 15, 2024) ("the inquiry as to whether a weapon is dangerous and unusual must be tethered to self-defense, not lawful purposes generally"). A weapon is not in common use if it is deemed to be dangerous and unusual. <u>O'Neil v. Neronha</u>, 594 F. Supp. 3d 463, 472 (D. RI. Mar. 15, 2022) (internal citations and quotations omitted).

### i.   The Burden to Demonstrate that Stun Guns and Tasers are in Common Use Rests with Plaintiffs

Plaintiffs demonstrate a fundamental misunderstanding of the two-part test described above by stating that "[t]he government must demonstrate that [stun guns and tasers] are not in common use." <u>See</u> Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (" Pl. Memo") at 10. Plaintiffs are simply incorrect.

With respect to the initial burden in Second Amendment cases, <u>Bruen</u> itself makes clear that it rests with the plaintiff(s).  In formulating the new test, the Supreme Court stated that

---

[3] For this reason, plaintiffs' argument that once the common use issue is decided no further examination of history and tradition is necessary is incorrect. <u>See</u> Pl. Memo at 11-12.

the government need only justify its regulation once it was demonstrated that an individual's conduct was covered by the plain text of the Second Amendment.  See id. at 2129-30.  Further, the Court's use of the word "then" in the phrase "[t]he government must then justify its regulation" very clearly signals a burden shifting approach.

      Federal courts across the country have applied the first Bruen step consistent with the Supreme Court's carefully chosen language and treated the new test as a burden shifting framework.  See, e.g., N.A. for Gun Rights, Inc. v. City of San Jose, No. 22-cv-00501, 2023 U.S. Dist. LEXIS 120797, at *13 (N.D. Cal. July 13, 2023) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then shifts to the government…."); Def. Distributed v. Bonta, No. 22-cv-6200, 2022 U.S. Dist. LEXIS 195839, at *11-12 (C.D. Cal. Oct. 21, 2022); United States v. Brady, No. 22-cr-47, 2023 U.S. Dist. LEXIS 203521, at *3 (N.D. Ind. Nov. 12, 2023) ("When the Second Amendment's plain text protects certain conduct, the burden shifts to the government…."); Boland v. Bonta, No. 22-cv-01421, 2023 U.S. Dist. LEXIS 51031, at *16 (C.D. Cal. Mar. 20, 2023) ("The Constitution presumptively protects Plaintiffs' proposed conduct. The burden now shifts to the government."); United States v. Deryke, No. 23-cr-92, 2023 U.S. Dist. LEXIS 193043, at *11 (W.D. Mich. Oct. 27, 2023) ("In Bruen, the Court endorsed a burden-shifting framework…."); Oregon Firearms Fed'n, Inc. v. Brown, 644 F. Supp. 3d 782, 799 (D. Or. 2022) ("Therefore, Plaintiffs have failed to show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain test of the Second Amendment."); Rocky Mountain Gun Owners v. Polis, No. 23-cv-01077, 2023 U.S. Dist. LEXIS 137087, at *20 (D. Colo. Aug. 7, 2023) ("After determining that a plaintiff's conduct is covered, the burden shifts to the government…."); United States v. Alston, No. 22-cr-178, 2023 U.S. Dist. LEXIS 189989, at *2 (E.D.N.Y. Oct. 23, 2023); N.A. for Gun Rts. v. Lamont, No. 3:22-1118

(JBA), 2023 U.S. Dist. LEXIS, 134880 (D. Conn. Aug. 3, 2023). Moreover, this approach is consistent with the Supreme Court's treatment of First Amendment claims, where the "plaintiff bears certain burdens to demonstrate an infringement of his rights" before the focus turns to the government.  Kennedy v. Bermerton Sch. Dist., 142 S. Ct. 2407, 2421 (2002); Rupp, 2024 U.S. Dist. LEXIS 46430 at * 20-21 ("analogizing the Second Amendment to the First Amendment (as Heller and Bruen often did) suggests that the plaintiff bears the burden at step one.").

### ii.   Plaintiffs Fail to Demonstrate that Stun Guns and Tasers are in Common Use for Self-Defense in the United States

Whether a weapon is considered to be in common use is "an objective and largely statistical inquiry." N.Y. State Rifle & Pistol Association v. Cuomo, 804 F.3d 242, 255-56 (2d Cir. 2015) (in order to demonstrate that assault weapons are in "common use" plaintiffs provided statistical evidence showing that 4 million units of a single assault weapon were manufactured during a certain time period.). A variety of statistics including "raw number, percentage and proportion, [and] jurisdiction-counting" identify "potentially relevant data for the common use inquiry." Berger, 2024 U.S. Dist. LEXIS 20259, at *28-31 ("[e]very post-Heller case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form, creating a consensus that 'common use is an objective and largely statistical inquiry.'") (internal citations omitted); Jones v. Bermudez, No. 15-cv-8527 (PKC)(BCM), 2019 U.S. Dist. LEXIS 25371, at * 22 n. 7 (S.D.N.Y. Feb. 14, 2019)("[s]ince Heller, courts in this Circuit have required substantial statistical evidence showing the popularity of a weapon before concluding that it is protected by the Second Amendment.") O'Neil, 594 F. Supp. 3d at 472 ("[g]enerally, the common use inquiry involves a statistical analysis.").

Notwithstanding that plaintiffs incorrectly impute their burden on defendants (see Pl. Memo at 10), plaintiffs provide no evidence whatsoever to support their claim that stun guns

and tasers are in common use in the United States for self-defense, let alone in New York City. See generally, Pl. Memo. Contrary to cited caselaw, plaintiffs' papers are completely bereft of any statistical analysis. Indeed, plaintiffs fail to cite to any studies, reports, or data demonstrating that stun guns and tasers are commonly used for self-defense. Shockingly, plaintiffs do not even identify the most basic of statistics including, for example, the number of stun guns and/or tasers purchased in the United States for any given year. Id.[4]

Plaintiffs merely cite to Caetano v. Massachusetts, 577 U.S. 411 (2016), to support their position. Pl. Memo at 10-11. However, the court's majority holding in Caetano is not the be-all and end-all plaintiffs claim it to be. In Caetano, the Supreme Judicial Court of Massachusetts upheld a law prohibiting the possession of stun guns based on three reasons: (1) that stun guns are not protected by the Second Amendment because they "were not in common use at the time of the Second Amendment's enactment;" (2) that stun guns are dangerous and unusual because "they are a thoroughly modern invention;" and (3) that these weapons are not "readily adaptable to use in the military." Id. The Supreme Court reversed and remanded the case for further proceedings, finding that "the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent." Id. at 411. Addressing each reason above in turn, the Supreme Court determined that the lower court was incorrect because: (1) Heller expressly stated that the Second Amendment extends to arms not in existence at the time the Second Amendment was enacted; (2) "equating 'unusual' with 'not in common use'" at the time of the Second Amendment's enactment was also inconsistent with Heller; and (3) Heller

---

[4] Even though plaintiffs have not provided any evidence illustrating the number of stun guns and tasers possessed by individuals throughout the United States, we know that there is significantly less stun guns and tasers than there are firearms. See https://www.safehome.org/data/firearms-guns-statistics/ (last visited Apr. 22, 2024) ("In 2022, approximately 17.4 million guns were sold in the United States").

explicitly rejected the proposition that "only weapons useful in warfare are protected" under the Second Amendment. Id. quoting Heller, 554 U.S. at 624-625. Contrary to plaintiffs' assertions, the Caetano court's majority opinion did not say that stun guns are in fact in common use. Rather, the Court only determined that the reasoning used by the Massachusetts court to decide whether stun guns are subject to Second Amendment protection was outdated in light of Heller and therefore not informative or persuasive. Rather than cite the opinion of the majority, Plaintiffs rely on language from Justice Alito, which is obviously not binding precedent.[5]

Nor have plaintiffs presented any evidence that stun guns and tasers are commonly used for self-defense. In Heller and Bruen, the Supreme Court recognized handguns as the quintessential weapon of choice for purposes of self-defense. See generally, Heller, 554 U.S. 570; Bruen, 597 U.S. 1. As such, the Court found no question as to whether handguns are in common use today. The same cannot be said of stun guns and tasers. While stun guns and tasers may be commonly used by law enforcement as a less lethal means by which to subdue criminals, there is no evidence that civilians use stun guns and tasers for purposes of self-defense, especially not in any significant number. Following Bruen, it is now clear that *self-defense* in the event of a confrontation (whether at home or in public) lies at the heart of the Second Amendment. See Bruen, 597 U.S. at 30-31. Accordingly, it logically follows that the type of weapons protected under the Second Amendment must be those that are used for purposes of self-defense.

---

[5] The additional caselaw relied upon by plaintiffs is no more helpful to their cause. See Pl. Memo at 12-15. For example, in reaching the decision in Avitable v. Beach, 368 F. Supp. 3d 404 (N.D.N.Y. 2019), the court utilized the means-end scrutiny analysis which has since been abrogated by Bruen. See page 8 supra. Indeed, the Avitable court's reliance on a now outdated and defunct means of analysis renders Avitable significantly less persuasive than it was prior to Bruen in 2022. Plaintiffs' citations to Michigan, Massachusetts, and Illinois cases are even more unconvincing. These cases are all state court cases that lack any binding precedential effect on this court and were similarly decided prior to Bruen.

Accordingly, as plaintiffs have "not shown that [stun guns and tasers] fall within the scope of the Second Amendment's plain text," the Court should end its analysis at the first step of the <u>Bruen</u> test. <u>See</u> <u>Rupp</u>, 2024 U.S. Dist. LEXIS 46430 at *21-22.

### iii. Defendants Establish that Unfettered Access to Stun Guns and Tasers in New York City is Dangerous

First, plaintiffs assert in a mere conclusory manner that defendants "have not established that stun guns and tasers are both 'dangerous and unusual.'" Pl Memo at 10. Clearly, plaintiffs have not read defendants' expert report.  Second, plaintiffs note that counsel for Taser Systems, Inc., claimed that "the Taser is not only non-lethal but is meaningfully less dangerous than any other self-defense weapon heretofore created." Pl. Memo at 3. Contrary to this self-serving statement from the weapon's own manufacturer, data shows that when put in the hands of even the most trained individuals, stun guns and tasers can be dangerous, and in fact, fatal. <u>See</u> Sadowski Dec., ¶¶ 7-8.

Between 2010 and 2021, "at least 513 individuals have died in the U.S. as the result of being fired upon with tasers by police." <u>See</u> Schonfeld Dec. Ex. B at 7; Defendants' Stmt., ¶ 30. And, for a 20-year period between 2000 and 2020, "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." <u>Id.</u> at ¶ 31. Many critics maintain concerns that when an individual fires a taser, they can administer "repetitive painful shocks" once the electric darts are fired. These repetitive shocks "increase the likelihood of a fatal outcome by 50-75%." Schonfeld Dec., Ex. B at 9. Tellingly, the fatalities discussed in this paragraph are all the result of civil-police encounters. Causes for concern are only magnified when these weapons find their way into civilian hands. Law enforcement officials, for the most part, are trained on use and operation of these weapons whereas civilians are not. <u>See</u> Schonfeld Dec., Ex. B at 9; Sadowski Dec., ¶¶  10-13. This lack of training suggests that "adverse or

unjustified use and results would only be greater in civilian hands, as [stun guns and tasers] pose a greater hazard when used by people who are untrained in their use and consequences." Schonfeld Dec., Ex. B at 27; Sadowski Dec., ¶ 14.

Further concerns about the dangerousness of stun guns and tasers arise when these weapons are used by perpetrators to commit crimes. Over the years, these devices have developed a particular criminal appeal because assailants "use the devices to intimidate victims into cooperation." Schonfeld Dec., Ex. B at 8. Even more disturbing, stun guns and tasers have been used by criminals to "even torture victims." Defendants' Stmt. ¶ 29; Schonfeld Dec., Ex. B at 27.[6]

To that end, allowing unrestricted possession and use of stun guns and tasers presents even more risk in a city as densely populated as New York City. In the context of firearm licensing, the Bruen court opined that it was "easy to see" why seven jurisdictions--all of which were among the most densely populated jurisdictions in the country--"might choose to regulate firearm carriage more strictly than other states." See Bruen, 597 U.S. at 100-101. ("densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas."). Accordingly, unregulated use of tasers and stun guns by untrained individuals presents a unique danger in a city like New York that must account for "8.5 million people living in 303 square miles." Id. at 91.

Ultimately, plaintiffs have failed to satisfy step 1 of the Bruen analysis. Plaintiffs do not provide any evidence to support their assertion that stun guns and tasers are in common

---

[6] Additional safety concerns arise when citizens purchase stun guns and tasers on the internet or, for example, from a local New York City convenience store. Sadowski Dec., ¶ 9. Tasers used specifically by officers in the NYPD are always purchased from a reputable source, and therefore guarantee a certain level of quality and effectiveness. Devices bought off websites on the internet or in random stores do not have the same level of quality control which can lead to further misuse, injury, and death. Id.

use in the United States, let alone in New York City, for purposes of self-defense. Thus, they

have not shown that stun guns and tasers "fall within the Second Amendment's plain text" and,

therefore, their motion for summary judgment should be denied.

C.   <u>Bruen</u> **Step 2: The City has Demonstrated that the Regulation of Stun Guns and Tasers is Consistent with the Historical Tradition of the Regulation of Non-Firearm Weapons in the United States**

Assuming <u>arguendo</u>, that plaintiffs have demonstrated that Penal Law § 265.01

and Administrative Code § 10-135 implicate conduct protected by the plain text of the Second

Amendment, the government must then demonstrate that the regulations are consistent with the

Nation's "history and tradition" of the regulation of non-firearms. <u>See</u> <u>Antonyuk v. Chiumento</u>,

89 F.4th 271, 365 (2d. Cir. 2023); <u>Mintz</u>, 2024 U.S. Dist. LEXIS 61699 at *56; <u>Bruen</u>, 597 U.S.

at 17 ("When the Second Amendment's plain text covers an individual's conduct, the

Constitution presumptively protects that conduct" . . . . the government must then justify its

regulation by demonstrating that it is "consistent with the Nation's historical tradition of firearm

regulation."). A court is not required to "embark on its own historical inquiry" to determine

whether a non-firearm regulation is consistent with the Nation's historical tradition. Rather, a

court is allowed to "decide a case based on the historical record compiled by the parties." <u>Id.</u> at

*14.   At the outset, it is important to note that the Supreme Court has already identified a

tradition of banning "dangerous and unusual weapons."

Frequently, the historical inquiry is straightforward. "When a challenged

regulation addresses a general societal problem that has persisted since the 18th century, the lack

of a distinctly similar historical regulation addressing that problem is relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." <u>Bruen</u>, 597 U.S. at 26.

However, when the challenged regulation does not clearly address a general societal problem,

the historical inquiry will "often involve reasoning by analogy." <u>Bruen</u>, 597 U.S. at 28. "Like all

analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern [non-firearm] regulation requires a determination of whether the two regulations are 'relevantly similar.'" Id. Two regulations are considered 'relevantly similar' when they "impose a comparable burden on the right of armed self-defense" and that the "burden is comparably justified." Id. at 29. Such analogical approach "requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. at 30. The Supreme Court has also said that when a case implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" may be required. Bruen, 597 U.S. at 27. Since the regulations at issue herein do not address a clear general societal problem, and implicate unprecedented technological changes in the form of a weapon that did not exist around the time of the ratification of the Second or Fourteenth amendments, defendants must proceed with reasoning by analogy.

### i.    The History of Stun Guns and Tasers

Stun guns and tasers are modern weapons that were adapted primarily for law enforcement and military use, not self-defense. Stun guns were first developed in the 1930s for "farming control," but were later used for riot control in the 1950s and 1960s. Schonfeld Dec., Ex. B at 5. Tasers, developed in the 1960s and 1970s, were created as "non-lethal" or "less-than-lethal" weapons for use on airlines and by law enforcement. Id. at 6; Defendants' Stmt. ¶ 23. Today, "over 90% of law enforcement agencies are equipped with [tasers]." Schonfeld Dec., Ex. B at 6.

Because the sale of tasers and stun guns was initially unregulated and because of the weapons' criminal appeal, civilians acquired these weapons to use for unlawful purposes. In fact, a 2012 investigation found that stun guns and tasers "have gained popularity among robbers who use the devices to intimidate victims into cooperation." Id. at 8. The same 2012

investigation concluded that criminals find these weapons "appealing because they are less lethal and less expensive than firearms, are readily available, are less likely to be mistaken for firearms by police in a perpetrator-police encounter, and in most places do not result in sentence enhancement if used in crimes (unlike guns)." Id.

Due to their increased association with criminal activity, states began regulating stun guns and tasers. Between 1970 and the early 2000s, "at least seven states, including New York State, enacted laws that barred civilian possession of stun guns and tasers." Id. at 6; Defendants' Stmt. ¶ 24. Additionally, approximately "40 localities in 15 states . . . enacted similar restrictions (including cities, towns and countries)." Schonfeld Dec., Ex. B at 7; Defendants' Stmt. ¶ 25. During this time, "17 states and nearly 130 localities (cities, towns, counties) imposed carry bans." Schonfeld Dec., Ex. B at 7; Defendants' Stmt. ¶ 26.

In addition to the implementation of regulations at the city and state level, various organizations emphasized the importance of establishing training protocols for proper use by law enforcement of stun guns and tasers, as well as "research into the physiological effects of taser and stun gun use," and greater overall oversight of their use. Schonfeld Dec., Ex. B at 8. For example, in 2005, the Police Executive Research Forum and the International Association of Chiefs of Police issued recommendations on how and when law enforcement should use tasers. Id. These policy recommendations suggested that tasers "be used against only those who are actively resisting, that they not be used against minors or the elderly except in emergency situations, and that each deployment be closely supervised." Id. at 9.

Similarly, the NYPD requires that officers participate in extensive training courses prior to the use of stun guns and tasers. Sadowski Dec., ¶ 10. These trainings teach officers how to correctly operate stun guns and tasers including how to load and unload the

devices, proper probe placement, and how to "determine a preferred target area." Id. at ¶ 11. Additionally, officers are trained to quickly recognize high risk individuals where the use of stun devices in a certain situation would be particularly dangerous, or even fatal.  Id. at ¶ 12. Once the training courses are complete, officers are required to pass a written exam and a rigorous hands-on practical exam. Id. ¶  13.

### ii.    The Historical Regulations of Non-Firearm Weapons are Relevantly Similar to New York City's Regulations of Stun Guns and Tasers

The regulation of "less-lethal" non-firearm weapons associated with criminal activity throughout American history demonstrates that such weapons were subject to significant, widespread, and varied regulation "remarkably similar to that of stun guns and tasers." Schonfeld Dec., Ex. B at 10.

### a.   Bowie knives

Traditional regulation of Bowie knives provides a historical analogue to the regulation of stun guns and tasers. Bowie knives became widely known in the 1830s for their "distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named." Id. at 11. Bowie knives, which were known as "fighting knives," were often used in combat, duels, brawls, and other criminal activities, especially because pistols were often "unreliable and inaccurate."  Id. at 12.

Due to the Bowie knife's increasing association with criminal activity in the 1830s, a widespread enactment of laws was introduced to prohibit dueling in the states, presumably to lessen the prevalence of the weapon in civilian society. Id. at 13-14. Similarly, multiple courts in the 1840s upheld convictions of individuals for the violation of statutes and laws that prohibited the carry of Bowie knives. For example, in the 1840 case of Aymette v. State, 21 Tenn. 152, 153 (Tenn. 1840), Tennessee's Supreme Court upheld the conviction of an

individual for carrying a Bowie knife under his clothes in violation of a state law. Specifically, state law 1837-1838, ch. 137, sec. 2 provided that "if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife . . . or keep the same concealed about his person such person shall be guilty of a misdemeanor…" Schonfeld Dec., Ex. B at 14. The court opined that the prohibition against wearing these dangerous weapons was justified because such weapons were "usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." Id. at 14; Aymette, 21 Tenn. at 156. The Court further noted that the state law existed to "preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperados with concealed arms…" Aymette, 21 Tenn. at 157. Similarly, in the 1844 case of Haynes v. Tennessee, 24 Tenn. 120 (1844), the Tennessee Supreme Court again reviewed the constitutionality of a law banning the carrying of a concealed Bowie knife. Schonfeld Dec., Ex. B at 15. The court upheld the law as constitutional and commended the Tennessee state legislature's enactment noting that the "design, meaning, and intent [of the law] was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill…" Id. at 123. See also Cockrum v. State, 24 Tex. 394, 403 (1859) (an individual who carries a Bowie knife "makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon.").

As time went on, more and more states enacted regulations to prohibit the carrying of Bowie knives and similarly dangerous weapons. Twenty-nine states enacted laws banning concealed carry of Bowie knives; 15 states barred their carry "whether concealed or openly," while other states "imposed taxes on individuals' acquisition or possession of them."

See Defendants' Stmt. ¶¶ 32-33; Schonfeld Dec., Ex. B at 17-18.  In 1837, Georgia passed a law trying to extinguish the outright circulation of Bowie knives by making it unlawful "to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . ." Schonfeld Dec., Ex. B at 18. Similarly, in 1881, Arkansas enacted a law which combined no-carry provisions with provisions that made it a misdemeanor to sell Bowie knives and other dangerous weapons. Id. Indeed, the utility of these concealed carry restrictions and sale restrictions "was precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapon-fueled violence." Id. at 18.

### b.  Clubs and other Blunt Weapons

"Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons." Schonfeld Dec., Ex. B at 20. Examples of such types of weapons included bludgeons, billy clubs, slungshots, and sandbags.[7] Id. at 20-23; Defendants' Stmt. ¶¶ 32-43.

Many laws included provisions prohibiting a weapons' "manufacture, possession, sale, or use in crime." Schonfeld Dec., Ex. B at 20. For example, 15 states prohibited bludgeon carrying and 16 states had anti-billy club laws—the earliest of which was enacted in Kansas in 1862. Id. at 22; Defendants' Stmt. ¶¶ 37-38. Additionally, anti-slungshot laws were "enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s." Schonfeld Dec., at 21-22;

---

[7] A billy club "is a heavy, hand-held rigid club, usually made of wood, plastic, or metal, that is traditionally carried by police." Schonfeld Dec., Ex. B at 21. A slungshot "is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle." Id. at 22. A sandbag (or sandclub) consisted of "sand poured into a bag, sack, sock or similar tube-shaped fabric" used for striking an individual. Id. at 23.

Defendants' Stmt. ¶ 39. Sandbags were also the subject of numerous anti-carry laws. Schonfeld Dec., Ex. B at 23. Anti-sandbag laws were first enacted in 1866 "with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s." Id. at 23-24; Defendants' Stmt. ¶ 40.

### c.   Toy Guns

A final historical analogue to modern stun gun and taser regulation is found in the analysis of the historical restrictions on toy guns.  Although these guns "lacked the firepower and deadliness of traditional firearms" they were nonetheless "dangerous and posed a risk to society" similar to stun guns and tasers. Schonfeld Dec., Ex. B at 24.

Toy guns included cap guns (which used a form of mild explosive to create a "popping sound and puff of smoke when the trigger was pulled"), BB guns, air guns and spring guns. Id. at 24-25. Due to the increased circulation and injury inducing accidents (one fatal) surrounding these toy guns, during the late 1800s and early 1900s, states and municipalities began enacting laws restricting their "sale, manufacture, discharge or carry." Id. at 25. Between the 1880s and early 1900s, at least 31 states enacted anti-toy gun laws. Id. at 26; Defendants' Stmt. ¶ 42.  A majority of these laws made it criminal to "sell, give, or otherwise pass to minors toys guns and other dangerous weapons or items…." Schonfeld Dec., Ex. B at 26.  Concerns surrounding toy guns did not dissipate after the early 1900s. In the 1930s, organizations burned toy guns that "resembled gangster weapons" and in 1955, New York City "banned black, blue and silver toy guns." Id.

### iii.   Historical Analysis Suggests that Penal Law Section 265.01 and Administrative Code Section 10-135 are Constitutional and Should be Upheld

It is clear from the above historical analysis that all of the weapons discussed herein--including tasers, stun guns, bowie knives, clubs, and toy guns--"follow a nearly identical regulatory pattern." Id. at 26. Indeed, Penal Law § 265.01 and Administrative Code § 10-135 are

simply a more current chapter in this tradition. First, a weapon is invented and developed. Second, the weapon may or may not be patented. Third, the weapon is typically adapted for law enforcement or military use. Fourth, these weapons then spread to "civil society." Finally, if a weapon "becomes associated with criminality or poses a public health or safety problem, calls for regulation ensue." Id. at 27. Stun guns and tasers clearly follow the same regulatory trajectory: (1) stun guns and tasers were developed primarily for law enforcement purposes, not for self-defense; (2) after years of being unregulated, stun guns and tasers found their way into the hands of civil society; (3) the use of stun guns and tasers to commit crime increased; and (4) their increased use in criminal activity ultimately prompted the enactment of laws restricting their possession, sale, and use. "In short, the history of these devices, when considered in the light of historical non-firearm regulations in American history  . . . . militates in favor of the current legal restrictions in New York." Id. at 27.

Based on the above, the regulation of stun guns and tasers and non-firearm weapons such as clubs, toy guns, and bowie knives are "relevantly similar" using the Supreme Court's metrics of "why" and "how."  With respect to "why," the regulations of the weapons discussed herein were borne from the fact that they were associated with criminal activity rather than legitimate self-defense needs.  As for the "how" metric, the historical analogues are regulated in a remarkably similar manner to Penal Law § 265.01 and Administrative Code § 10-135 in that they constituted complete bans on the possession, carry and sale of the weapons at issue.

Based on this extensive analysis, defendants have clearly met the burden set forth in step 2 of the Bruen analysis by demonstrating that Penal Law § 265.01 and Administrative

Code § 10-135 are "consistent with the Nation's historical tradition of [non-firearm] regulation." <u>Bruen</u>, 597 U.S. at 24.

<u>**CONCLUSION**</u>

Plaintiffs' motion for summary judgment should be denied. Plaintiffs fail to provide any hard data supporting their position that stun guns and tasers are in common use for self-defense. Regardless, even if plaintiffs could show that their proposed conduct is covered by the plain text of the Second Amendment, defendants have satisfied their burden to demonstrate that the regulation of stun guns and tasers is relavantly similar to the historical tradition of non-firearm weapons regulation in the United States. Accordingly, plaintiffs' motion for summary judgment should be denied and defendants' cross-motion for summary judgment should be granted.

Dated:      New York, New York
            April 26, 2024

                          Respectfully submitted,

                          HON. SYLVIA O. HINDS-RADIX
                          Corporation Counsel of
                              the City of New York
                          Attorney for Defendants
                          100 Church Street
                          New York, New York 10007
                          (212) 356-2183


                          By:      /s/ Samantha Schonfeld
                                 _____
                                 Samantha Schonfeld
                                 Assistant Corporation Counsel