UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; AMANDA KENNEDY; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br>                    Plaintiffs, <br><br>       -against- <br><br> CITY OF NEW YORK; and DERMOT SHEA, in his official capacity as Commissioner of the New York City Police Department, <br><br>                    Defendants. | No. 1:21-cv-08208-ER |

**PLAINTIFFS' MEMORANDUM OF LAW IN REPLY AND IN OPPOSITION
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

David D. Jensen, Esq.
DAVID JENSEN PLLC
33 Henry Street
Beacon, New York 12508
Tel:  212.380.6615
david@djensenpllc.com
*Attorney for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ *ii*

I)      INTRODUCTION ................................................................................ 1

II)     THE SECOND AMENDMENT PROTECTS THE ARMS THAT DEFENDANTS
        TARGET WITH THEIR BANS ............................................................. 2

        A.      The Banned Conduct is Unquestionably Protected Under the "Plain Text" .......... 2

        B.      Defendants Attempt to Dodge Their Burden by Conflating the Textual Inquiry
                with the Historical Inquiry to Purportedly Shift the Burden to Plaintiffs ................ 4

        C.      "Common Use" Undoubtedly Means Common Possession ................................. 7

        D.      Defendants' Focus on Inherent Dangerousness is Just Another Distraction ........ 10

III)    DEFENDANTS FALL FAR SHORT OF CARRYING THEIR ACTUAL
        BURDEN ON THE HISTORICAL PRONG ............................................... 12

        A.      The Bans Are Subject to Full Scrutiny Under Bruen ......................................... 13

        B.      The Relevant Historical Period Under Bruen ................................................... 15

        C.      Defendants' Purported Analogues ................................................................... 19

                1.   Bowie Knives ....................................................................................... 20

                2.   Clubs and Other Blunt Weapons ......................................................... 22

                3.   Toy Guns ............................................................................................... 23

        D.      Defendants' Reliance on Improper Opinions Underscores the Problem .............. 24

IV)     CONCLUSION .................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)................................................... 19

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019)...................................... 4, 7

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .............................................. *passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................... *passim*

*Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299 (3d Cir. 2020)...................... 12

*Gamble v. United States*, 587 U.S. 678 (2019) ................................................... 16-17

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ......................... 9, 18

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir.1992) ......................................................... 24

*In re Rezulin Products Liability Litigation*, 309 F.Supp.2d 531 (S.D.N.Y. 2004) ...... 24

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) (*vacated on rehearing en banc*)............. 7

*Khan v. State Oil Co.*, 93 F.3d 1358 (7th Cir. 1996), *vacated by State Oil Co. v. Khan*,
      522 U.S. 3 (1997) ......................................................................................... 16

*Konigsberg v. State Bar of Cal.,* 366 U.S. 36 (1961) ............................................. 2

*Lara v. Commissioner of Penn. State Police*, 91 F.4th 122 (3d Cir. 2024) ................ 16

*Maloney v. Singas*, 351 F. Supp. 3d 222 (E.D.N.Y. 2018)....................................... 4

*McDonald v. Chicago*, 561 U.S. 742 (2010) .............................................. 11, 14-16

*Muscarello v. United States*, 524 U.S. 125 (1998)................................................... 8

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)............. 4, 8, 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022).............................. *passim*

*Nimley v. City of New York*, 414 F.3d 381 (2d Cir. 2005)........................................ 24

*O'Neil v. Neronha*, 594 F.Supp.3d 463 (D.R.I. 2022)................................................ 7

*People v. Webb*, 131 N.E.3d 93 (Ill. 2019) ............................................................. 6

*People v. Yanna*, 297 Mich. App. 137 (Ct. App. 2012) ........................................... 7

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc) ........................ 19

*Robinson v. Liberty Mutual Ins. Co.*, 958 F.3d 1137 (11th Cir. 2020) .......................................... 7

*State v. Huntly*, 25 N.C. 418 (1843) .............................................................................................. 9

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (*vacated on rehearing en banc*) ............................. 7

*United States v. Davis*, 726 F.3d 357 (2d Cir. 2013)..................................................................... 7

*United States v. Duncan*, 42 F.3d 97 (2d Cir.1994) ..................................................................... 24

*United States v. Lopez*, 880 F.3d 974 (8th Cir. 2018) ................................................................... 7

## **Statutes**

1837 Ga. Acts 90, §§1–4 ............................................................................................................... 21

1837-38 Tenn. Pub. Acts 200-01, ch. 137, §2 .............................................................................. 21

1838 Va. Acts ch. 101.................................................................................................................... 21

1839 Ala. Acts 67, §1 .................................................................................................................... 21

1849 Cal. Stat. 245, §127.............................................................................................................. 23

1853 N.M. Laws 406, §25 ............................................................................................................. 21

1855 La. L. Chap. 120, Sec. 115 ................................................................................................... 21

1858 Neb. Laws 69, §135 ............................................................................................................. 23

1859 Ohio Laws 56, §§1-2 ............................................................................................................ 21

1862 Colo. Sess. Laws 56, §1 ....................................................................................................... 21

1864 Mont. Laws 355, §1 ............................................................................................................. 21

1870 W. Va. Code 692, ch. 148, §7 .............................................................................................. 21

1871 Tex. Laws 25, §1 ............................................................................................................21-22

1874-75 Ark. Acts 156 .................................................................................................................. 21

1876 Colo. Sess. Laws 304, General Laws, §154 ......................................................................... 23

1878 Miss. Laws 175, §1 .............................................................................................................. 21

1881 Ark. Acts 191, ch. 96, §§1-2 ............................................................................................... 22

1882 W. Va. Acts 421–22 ...................................................................................... 21-22

1883 Mo. Laws 76, §1274 ........................................................................................ 21

1887 Mont. Laws 549, Criminal Laws, §174 .......................................................... 23

1891 Mich. Pub. Acts 409 ........................................................................................ 21

1893 Ariz. Sess. Laws 3, §1 ..................................................................................... 21

1893 R.I. Pub. Laws 231, ch. 1180, §1 ................................................................... 21

Charles Nettleton, Laws of the State of New-Jersey (1821), An Act to Describe, Apprehend and Punish Disorderly Persons (1799), §2 ......................................... 23

Compiled and Revised Laws of the Territory of Idaho (M. Kelly, Territorial Printer 1875), Crimes and Punishments §133 ........................................................... 23

Compiled Laws of California (1853), §127 .............................................................. 23

Dist. of Col., An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, Ch. XXV ...................................................................................................... 21

John Prentiss Poe, The Maryland Code (1888) Concealed Weapons, §30 ........................... 21, 23

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia (1821), Offences Against the Public Peace §19 ................................................................... 23

Mason Brayman, Revised Statutes of the State of Illinois (1845), Criminal Jurisprudence, §139 ............................................................................................... 23

N.C. Sess. Laws (1879) ch. 127, §1 ........................................................................ 21

N.Y. City Admin. Code §10-135 ............................................................................ 1, 25

N.Y. Penal L. §265.01 ............................................................................................ 1, 25

The Laws Of Maryland (1811) 465 .......................................................................... 23

Wyo. Comp. Laws (1876) ch. 35, §127 ................................................................... 23

## **Other Authorities**

1 A New and Complete Law Dictionary ..................................................................... 2

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) ...................................... 15

Dictionary.com, https://www.dictionary.com/browse/facilitate .................................... 8

Eugene Volokh, *Nonlethal self-defense, (almost entirely) nonlethal weapons, and the rights to keep and bear arms and defend life*, 62 Stan. L. Rev. 199 (2009) ............................ 7

Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), available at https://bit.ly/3CMSKjw ........................................ 16

Randolph Roth, American Homicide (2009) available at https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf ............................ 14

**Rules**

Fed. R. Evid. 201, advis. comm. note.......................................................................................... 7

**Constitutional Provisions**

U.S. Const. amend. II ................................................................................................................ 2

I)      **INTRODUCTION**

In their motion for summary judgment, Plaintiffs clearly explained how the controlling analysis under *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 17 (2022) simply and straightforwardly compels judgment in their favor and a permanent injunction against the challenged laws broadly banning stun guns and tasers in the State and City of New York (New York Penal Law §265.01(1) and New York City Administrative Code §10-135): stun guns and tasers are presumptively protected under the plain text of the Second Amendment and Defendants cannot carry their burden of demonstrating these bans are "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, because they are in common use for lawful purposes and therefore cannot be banned—period. That's a full stop because binding Supreme Court precedent has already established the relevant contours of the historical tradition that a court must examine when the Court declared that arms in common use for lawful purposes cannot be banned because, by definition, they cannot be both dangerous *and* unusual. And, any further historical analysis could not yield a different result because the relevant historical record is bereft of anything on the order of timely, "relevantly similar" regulations that could justify these bans.

Defendants come back in opposition and in seeking summary judgment for themselves, claiming a different world order in analyzing the Second Amendment challenge to their bans— one that allows for a "textual" analysis that ignores the plain text and dodges their burden, and one that allows them to set up their own forgiving standards for drawing any historical analogues. Indeed, it's hard to see how *any* weapons ban would ever fail under *Defendants'* framework. But under *Bruen's* framework, bans like these unquestionably cannot be sustained. When all is said and done, the litigation maneuvering and avoidance strategies that Defendants employ in setting up their artificially lenient constructs make for some of the best evidence against them. Their

obvious need to actively avoid or blunt the impact of the *Bruen* standards highlights perhaps better than anything else that these bans are constitutionally indefensible—just as Plaintiffs contend.

## II)   THE SECOND AMENDMENT PROTECTS THE ARMS THAT DEFENDANTS TARGET WITH THEIR BANS

For all their efforts to contort the test into something it is not, Defendants are forced to at least implicitly acknowledge that the actual analysis in this case is simple and straightforward: if "the proposed conduct is covered by the plain text of the Second Amendment," then the government must "show that the challenged law/rule is consistent with our country's tradition of weapons regulation." Def. Brf. at 1, 7. Indeed, from *Heller* to *Bruen*, the Supreme Court has been crystal clear: the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *Bruen,* 597 U.S. at 17. If it does, that conduct is "presumptively protect[ed]" by the Second Amendment, and then the government must prove the restriction is consistent with "this Nation's historical tradition of firearm regulation" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17 (citing *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50 n.10 (1961)).

### A.   The Banned Conduct is Unquestionably Protected Under the "Plain Text"

The plain text of the Second Amendment explicitly declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II. And, as a matter of plain text, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). "The 18th-century meaning is no different from the meaning today," as "Arms" means " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id.* at 581 (quoting 1 A New and Complete Law Dictionary).

There is not and cannot be any dispute the stun guns and tasers banned under the challenged laws readily qualify for prima facie protection under the controlling definition of "arms." The plain meaning of the term as articulated in *Heller* and *Bruen* alone make this clear, but the Supreme Court's opinion in *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016), dealing specifically with stun guns, erases any conceivable doubt concerning the weapons at issue. There, the Supreme Judicial Court of Massachusetts upheld a ban against stun guns on the basis that they were not protected "arms" because they "were not in common use at the time of the Second Amendment's enactment" and because they were "unusual" as "a thoroughly modern invention." *Id.* The Supreme Court unanimously reversed. *Id.* at 412. The court explained that this holding was "inconsistent with *Heller's* clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding." *Id.* (quoting *Heller*, 554 U.S. at 582).

The *Bruen* Court cited *Caetano* in reiterating that, while the "definition of 'arms' is fixed according to its historical understanding, the general definition covers modern instruments that facilitate armed self- defense." *Bruen*, 597 U.S. at 28 (citing *Caetano*, 577 U.S. at 411-12). As Justice Alito's concurring opinion in *Caetano* further elucidates, "[e]lectronic stun guns are no more exempt from the Second Amendment's protections, simply because they were unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment." *Caetano*, 577 U.S. at 417.

That is the sum total of the textual analysis, which quickly and conclusively establishes that the plain text of the Second Amendment "covers" and thus "presumptively protects" the conduct at issue. *Bruen,* 597 U.S. at 17. And with that, the burden shifts directly to the government to prove these bans are consistent with "this Nation's historical tradition of firearm regulation." *Id.*

**B.**  **Defendants Attempt to Dodge Their Burden by Conflating the Textual Inquiry with the Historical Inquiry to Purportedly Shift the Burden to Plaintiffs**

Unable to dispute this clearly *textual* outcome, Defendants try to dodge the result and their burden by claiming the "plain text" analysis must go on before any historical analysis is conducted, because Plaintiffs bear the additional burden at this stage of first proving the arms are in "common use for self-defense." Def. Brf. at 1, 2, 7, 8-10. This is a fundamental distortion of the law.

The issue of "common use" is not an element of the textual analysis. As *Bruen* made clear, this prong of the analysis focuses solely on the "plain text" of the Second Amendment: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17; *id.* at 24. Indeed, nothing in *Heller* or *Bruen* suggests that commonality is even relevant, much less dispositive of whether an arm is accorded textual protection. Instead, the question of commonality is relevant to the *historical* prong, and thus it's a matter on which the *government* carries the burden of proof.

While *Bruen* emphasizes the Second Amendment's prima facie coverage of "Arms," and the government's concomitant obligation to disprove "common use," it is significant that this is already the law in the Second Circuit. In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), the Second Circuit expressly held that a pump action rifle was in "common use," even though there was no evidence going to the issue. *See id.* at 257 n.73. The Court explained that the Second Amendment "identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *Id.* (citations omitted). Significantly, two district courts in this Circuit have concluded that under *NYSRPA v. Cuomo*, the government must disprove "common use." *See Avitabile v. Beach*, 368 F. Supp. 3d 404, 412 (N.D.N.Y. 2019); *Maloney v. Singas*, 351 F. Supp. 3d 222, 226 (E.D.N.Y. 2018).

Following the methodology later made explicit in *Bruen*, *Heller* began by analyzing the scope of the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It construed the term "arms" to embrace "all instruments that constitute bearable arms," without regard to commonality. *Id.* at 582. *Heller* then analyzed the history of firearm regulation to assess potential limits on the right and held that *history* disclosed an "important limitation on the right to keep and carry arms," namely, that "*the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' " showed that "the sorts of weapons protected were those 'in common use.' " *Id.* at 627 (emphasis added). Thus, this was a rule developed from "*the historical understanding* of the scope of the right.*" Id.* at 625 (emphasis added). In *Bruen*, the Supreme Court plainly reaffirmed that *Heller*'s conclusion that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . *historical tradition*" and comported with the enactments of colonial legislatures that *Bruen* analyzed in its own historical review. 597 U.S. at 47 (emphasis added).

Being plainly protected by the text of the Second Amendment, the burden shifts to the government to "justify its regulation" of stun guns and tasers "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. And, under *Heller*'s binding constitutional test, Defendants' bear the burden of showing that stun guns and tasers are "dangerous *and* unusual." 554 U.S. at 627 (emphasis added). This is a conjunctive test, so Defendants must show both that the banned arms are "highly unusual in society at large" (i.e., not in common use), *id*., *and* that they pose a danger even when used in a lawful manner above and beyond that posed by other common, protected arms, *see Caetano*, 577 U.S. at 418 (Alito, J., concurring).

Defendants make no effort to meet this demanding burden and instead focus all their energy on conflating the historical inquiry with the textual inquiry to artificially engineer a "textual" test that purportedly compels Plaintiffs to affirmatively prove the matter of "common use" with "studies," "reports," "hard data," or other "evidence" demonstrating that stun guns and tasers are commonly used "for self-defense." Def. Brf. at 10, 11, 23. Defendants' argument betrays their fundamental misunderstanding of *Heller* and *Bruen*. As those cases make clear, the default rule under the plain text of the Second Amendment is that *all* weapons are protected. It will only be in extreme, outlier scenarios that a particular weapon will not be protected, and it is Defendants' burden, as just explained, to show that a weapon not only is *highly unusual* in society at large but also that it is *highly dangerous* compared to weapons that *are not* highly unusual in society at large. This obviously is an impossible task with respect to stun guns and tasers. "Any attempt … to rebut the *prima facie* presumption of second amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019). To be clear, Defendants must negate the typical possession of stun guns and taskers for *any* lawful purposes, not just the lawful purposes of self-defense. *See Heller*, 554 U.S. at 624–25.  And even Defendants could meet that burden (and they do not), Defendants could not show that stun guns and tasers present the type of danger that would rid them of constitutional protection. Indeed, because they are designed to impart "non-lethal force" and the Second Amendment protects firearms designed to impart lethal force, this is an "a fortiori" matter. *See Caetano*, 577 U.S. at 418 (Alito, J., concurring).

While Defendants sink their own case by abandoning their affirmative evidentiary burden, they also ignore the bevy of information indisputably establishing the nationwide commonality of

these arms. Indeed, they never bother to challenge or cite any basis for undermining the accuracy or reliability of this information. Nor is there any reason to doubt the prolific findings and conclusions throughout the numerous cases documenting them.[1]

Among the facts that Defendants have left entirely uncontested are findings and conclusions that "stun guns are widely owned and accepted as a legitimate means of self-defense across the country," *Caetano*, 577 U.S. at 420 (Alito, J., concurring); "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens, with many more in use by law enforcement officers," *People v. Yanna*, 297 Mich. App. 137, 144 (Ct. App. 2012) (citing Eugene Volokh, *Nonlethal self-defense, (almost entirely) nonlethal weapons, and the rights to keep and bear arms and defend life*, 62 Stan. L. Rev. 199, 206 n.28, 212 (2009)); "there are at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States," *Avitabile*, 368 F.Supp.3d at 411; "approximately 6.5 million stun guns have been sold to consumers between 2008 and 2020," and "Defendants agree that millions of stun guns have been sold nationwide," *O'Neil v. Neronha*, 594 F.Supp.3d 463, 473 (D.R.I. 2022).

## C.    "Common Use" Undoubtedly Means Common *Possession*

Defendants further distort the common use issue here by suggesting that the "use" counts only insofar as it involves actually employing the arms in instances of self-defense. Def. Brf. at 10, 11, 12, 14. It is clear, however, that what matters is common possession for purposes of *facilitating* self-defense *in case* of confrontation. Again, the Supreme Court has explained, "even

---

[1]       "[T]he historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.' Fed. R. Evid. 201, advis. comm. note (1972 proposed rules)." *Teter v. Lopez*, 76 F.4th 938, 946-47 (9th Cir. 2023) (*vacated on rehearing en banc*); *see also Jones v. Bonta*, 34 F.4th 704, 725-26 n.24 (9th Cir. 2022) (*vacated on rehearing en banc*) (relying on such legislative facts in analyzing a Second Amendment claim). Defendants do not claim otherwise. They only suggest these facts do not satisfy the normal rules of "evidence," but it is established that the rules of evidence do not apply to legislative facts. *See United States v. Davis*, 726 F.3d 357, 366 (2d Cir. 2013); *Robinson v. Liberty Mutual Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020); *United States v. Lopez*, 880 F.3d 974, 982 (8th Cir. 2018).

though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." 597 U.S. at 28. The plain meaning of "facilitate" is simply "to make easier or less difficult; help forward (an action, a process, etc.)." Dictionary.com, https://www.dictionary.com/browse/facilitate. Clearly, possession or ownership of an arm *facilitates* armed self-defense, by enabling the owner or possessor to use the weapon for such purposes if and when the need for such action arises—i.e., as a matter of *preparedness* in maintaining one's personal security against threats which *may* call for armed defensive actions.

Indeed, the word "bear" in the phrase "keep and bear Arms" means " 'being armed and *ready for* offensive or defensive action in a case of conflict with another person.' " *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). And, the Second Amendment " 'guarantee[s] the individual right to possess and carry weapons *in case of* confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592) (emphasis added). Otherwise, absurdly, the protections of the Second Amendment would not kick in until the moment a person is compelled to fire upon another person as a means of repelling force. It's clear that *possession* is what the Supreme Court meant for purposes of "common use." *See e.g.*, *Bruen*, 597 U.S. at 27 (quoting *Heller*, 554 U.S. at 627 ("[T]he Second Amendment protects *the possession and use* of weapons that are " 'in common use at the time.' ") (emphasis added); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (the "*relevant statistic* is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears *may lawfully possess* them in 45 states") (emphasis added); *Cuomo*, 804 F.3d at 255 (fact that "Americans *own* millions of the firearms that

the challenged legislation prohibits" shows that "the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*") (emphasis added).

Further cementing that *possession* is what matters here, the Court in *Heller* specifically recognized that the Second Amendment protects those firearms "typically *possessed* by law-abiding citizens for *lawful purposes*." 554 U.S. at 625 (emphasis added). This also highlights that the Second Amendment secures more than armed *self-defense*, contrary to Defendants' suggestion. The scope of the protection *includes* self-defense, but the right also extends to possession for other "lawful purposes." *See Bruen*, 597 U.S. at 48 & n.15 (approvingly citing *State v. Huntly*, 25 N.C. 418, 422–23 (1843), where the North Carolina Supreme Court stated that " 'the citizen is at perfect liberty to carry his gun' '[f]or any lawful purpose,' " as opposed to the " 'wicked purpose . . . to terrify and alarm' "); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting . . .") (citing *Heller*, 554 U.S. at 630).

Ultimately then, Defendants have failed or refused to carry their burden of demonstrating that the banned arms are *not* in common use for lawful purposes, and they cannot do so as the undisputed record of legislative facts establishes these arms are in common use nationwide. If an arm is "in common use" then it is, by definition, *not* dangerous and unusual. Again, *Heller* and *Bruen* speak with one voice, and they speak clearly here: when the government enacts a prohibition on arms, the only way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are 'in common use at the time.' " *Bruen*, 597 U.S. at 17, 21 (quoting *Heller*, 597 U.S. 627).

**D.      Defendants' Focus on Inherent Dangerousness is Just Another Distraction**

Nevertheless, Defendants throw out another red herring in repeatedly harping on the inherently "dangerous" nature and "widespread criminal appeal" of these arms based on their propensity to cause injuries and fatalities when misused. Def. Brf. at 4, 13, 14, 16, 17-18, 23. Of course, *all* weapons possess such potential—as they must in order to serve their core purpose of facilitating *armed* self-defense—and *Heller's* primary analysis of the Second Amendment already took account for the main concerns about the misuse of firearms in society. *See* 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution."). In fact, Justice Breyer spilled considerable ink writing about these potentialities. *See id.* at 682 (Breyer, J., dissenting) (defending the District of Columbia's handgun ban on the basis that handguns "are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals"); *id.* at 694–95 (pressing the District of Columbia's statistics concerning the number and extent of gun-related deaths in the District). A central idea behind the District of Columbia's handgun ban, stressed in Justice Breyer's dissent, was in fact " 'to reduce the potentiality for gun-related violence.' " *Id.* at 695.

Thus, the *Heller* majority considered the essential concerns that Defendants press here in lamenting how stun guns and tasers "can be dangerous, and in fact, fatal." Def. Brf. at 13. But the Court found them irrelevant to whether the arms at issue were protected, because that does not turn on whether arms are misused by criminals; it turns on, *inter alia*, whether law-abiding citizens commonly own and use them for lawful purposes, and it was enough in *Heller* to secure constitutional protection that handguns are *typically* possessed for lawful purposes. 544 U.S. at 624–25. The *Bruen* majority also took account for such risks and expressly set them aside: The Court noted "the dissent chronicles, in painstaking detail, evidence of crimes committed by

individuals with firearms." *Id.* at 17 n.3. Much like Defendants do here, "[t]he dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use." *Id.* "But, as Members of the Court have already explained, '[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications.' " *Id.* (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)).

The reason for this rationale is quite clear: attempting to justify the general ban against the targeted weapons based on the government's interest in combating such risks runs afoul of *Bruen's* express mandate that courts must abandon any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634.) *Heller's* distinction, reiterated by *Bruen*, between protected weapons "in common use at the time" and those that are "dangerous and unusual" loses all meaning if the government can ban a weapon in common use merely because the legislature concludes the weapon is potentially more dangerous relative to some other weapon. The dangerous *and* unusual test controls. This is why the Second Circuit itself has observed that "a weapon's association with crime," standing alone, "is insufficient" to justify the conclusion that law-abiding individuals do not typically possess the weapon for lawful purposes. *Cuomo*, 804 F.3d at 255-56. The government simply cannot make the showing required to justify a ban against protected arms when those arms are in common use for lawful purpose because, necessarily, such arms are not "dangerous and *unusual* weapons."

That is the case here. Because binding Supreme Court precedent has already established the relevant contours of the historical tradition that a court must examine in adjudicating the constitutionality of an arms ban—that arms in common use for lawful purposes cannot be

banned—any further examination of history and tradition is not necessary or appropriate. *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 308 n.8 (3d Cir. 2020). Under a proper analysis, that is the end of the analysis and the end of road for these arms bans.

### III)   DEFENDANTS FALL FAR SHORT OF CARRYING THEIR ACTUAL BURDEN ON THE HISTORICAL PRONG

By the time Defendants finally submit themselves to the historical inquiry, the reason for all their resistance in reaching this juncture of the analysis becomes clear: they have nothing to truly support the notion that their total bans against stun guns and tasers are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Indeed, as just explained, *Heller* already established the historical contours of what weapons can be banned notwithstanding the Second Amendment's text, and Defendants failed to meet their burden under *Heller*'s test. There thus is no need for any further historical inquiry. But even if that were not the case, Defendants still have not met their burden. This is obvious right out of the gate, as they elect to construct a sweepingly broad concept of a "historical tradition" as the yardstick for purposes of making any purported historical comparisons. Under this rationale, it's enough for the government to show that the bans "follow relevantly similarly regulatory trajectories as those of other non-firearm weapons" in that they "beg[a]n in a production phase," over time "made their way into public circulation," and became "increasingly used to commit crimes, thus creating an impetus for the enactment of a regulatory scheme." Def. Brf. at 2.

Such a "historical tradition" could capture virtually all manner of firearms regulations enacted at any time for any purpose assertedly related to public safety or the general welfare. Indeed, this suggests that governments can and should prevail under *Bruen* so long as they can show the law at issue was enacted contemporaneously with the "impetus for the enactment" of the regulation, *irrespective* of the contours of the relevant history under *Bruen*. Defendants imply that

they are entitled to leniency in framing their historical analysis here because "a 'more nuanced approach' may be required" when a case "implicates 'unprecedented societal concerns or dramatic technological changes.' " Def. Brf. at 15-16. This is not how *Bruen* works. As with the textual analysis, when Defendants are forced to follow the law dictated by *Bruen*, they fail on the historical analysis: "nuanced approach" or not, these bans find no legitimate historical basis under *Bruen*.

**A.    The Bans Are Subject to Full Scrutiny Under *Bruen***

In *Bruen*, the court noted that some cases "implicating unprecedented societal concerns or dramatic technological changes *may* require a more nuanced approach" since "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation 1868." *Bruen*, 597 U.S. at 27 (italics added). But *Bruen* made clear that even in applying this "nuanced approach," the government still needs to come forward with historical regulations that are "relevantly similar" to the challenged law. Under Defendants' rationale—allowing them to uphold a weapons bans so long as it tracks a generic pattern of production, circulation, and "an impetus" for a regulation to address criminal misuse— would circumvent the essential protections established in *Heller* and reaffirmed in *Bruen*. Ultimately, such a rationale would require courts to focus on the government's stated policy justifications in support of the challenged law, taking us right back to prohibited interest-balancing. *See Bruen*, 597 U.S. at 29 n.7 (quoting *Heller*, 554 U.S. at 635) (courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry" but must instead "apply faithfully the balance struck by the founding generation to modern circumstances" because "the Second Amendment is the 'product of an interest balancing *by the people*' ").

Surely, the *Bruen* Court meant no such thing for purposes of any "more nuanced" approach that may be applied. Indeed, at no point did the Court untether the required analogical analysis from the relevant historical period for any such purposes. In fact, the analytical foundation of this

discussion regarding nuances was the Court's earlier explanation that " 'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' " *Bruen*, 597 U.S. at 25 (quoting *McDonald*, 561 U.S. at 803-04). It then distinguished the historical analysis as superior to any form of interest-balancing:

> [R]eliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field.

*Id.* (quoting *McDonald*, 561 U.S. at 790-91).

Thus, in no event does the government get a free pass or a watered-down test even in cases that may "implicat[e] unprecedented societal concerns or dramatic technological changes."[2]

Having set the record straight that regardless of whether the challenged regulation is designed to address "unprecedented societal concerns or dramatic technological changes," "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" *still* "requires a determination of whether the two regulations are 'relevantly similar,' " *Bruen*, 597 U.S. at 28-29, we can review the proffered analogues through the right lens. Under that lens, to justify a regulation as "consistent with the Second Amendment's text and historical understanding," the government must demonstrate by "analogical reasoning" the existence of "a proper analogue." *Bruen*, 597 U.S. at 28. The analogue must be " 'relevantly similar.' " *Id.* at 28-

---

[2]     Defendants refer to both "unprecedented societal concerns" and "dramatic technological changes" in invoking *Bruen's* discussion of a "more nuanced approach." Def. Brf. at 16. However, they only press the notion of "dramatic technological changes" and do not claim their laws address "unprecedented societal concerns." *Id.* Indeed, the only real concern Defendants articulate is the criminal misuse of these arms, and that is surely nothing new. *Bruen*, 597 U.S. at 26 (firearm violence is "a general societal problem that has persisted since the 18th century"); Randolph Roth, American Homicide 27 (2009) available at https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf (for most of the 17th century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009). In any event, the test is the same even in the event of unprecedented concerns, as discussed above.

29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). It "may be analogous enough to pass constitutional muster" even if it's not "a historical *twin*" or a "dead ringer" for the modern regulation, but it must be "well-established and representative." *Id.* at 30.

*Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar," but "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden is comparably justified [the 'why'] are '*central*' considerations when engaging in an analogical inquiry," because "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* (quoting *McDonald*, 561 U.S. at 767). However, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. It must be the right period to be constitutionally relevant. This is the first problem with Defendants' purported historical analogues: the vast majority come too late in time.

### B.     The Relevant Historical Period Under *Bruen*

Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are explicitly "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. Again, the standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances" in deciding Second Amendment claims. *Id.* at 29 n.7 (emphasis added); *see* Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified*

*in 1791, and Not 1868* (Oct. 1, 2022), available at https://bit.ly/3CMSKjw; *see also Lara v. Commissioner of Penn. State Police*, 91 F.4th 122, 133 (3d Cir. 2024) (quoting *Bruen*, 597 U.S. at 37 ("Although *Bruen* did not definitively decide this issue, it gave a strong hint when it observed that there has been a general assumption 'that the scope of the protection applicable to the Federal Government and States [under the Bill of Rights] is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.' ").

While "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Bruen*, 597 U.S. at 38. Although *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings that (1) 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, 587 U.S. 678, 702 (2019), and (2) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765; *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings until it overrules them), *vacated by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling but noting the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents").

As for periods of time other than those surrounding the Founding Era, some may bear a degree of secondary significance while others may have little to no bearing. English common law prevailing at the time the Constitution "was framed and adopted" may have some relevance, *Bruen*, 597 U.S. at 39, but anything that "long predates" 1791 or 1868 is generally suspect because it may

not accurately "illuminate the scope of the right," *id.* at 34. The period "immediately after its ratification through the end of the 19th century" can be a "critical tool of constitutional interpretation," but "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. The main purpose of consulting such evidence is to *confirm* the public understanding of the right to keep and bear arms at the time Second Amendment was adopted. *Id.* at 36-37 (quoting *Gamble*, 587 U.S. at 701-02) (mid-to-late 19th century evidence in *Heller* "was 'treated as mere confirmation of what the Court thought had already been established' "); *Heller*, 554 U.S. at 600-01 ("Our interpretation is confirmed by analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment.").

Standing alone, evidence from the mid-to-late 19th century "do[es] not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36. Similarly, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66. Laws from this period that "conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.' " *Id.* at 67 (quoting *Heller*, 554 U.S. at 614, and referring specifically to the time period of 1861 to 1890); *id.* at 82-83 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.").

Nor does "20th-century historical evidence" that "contradicts earlier evidence" "provide insight into the meaning of the Second Amendment." *Bruen*, 597 U.S. at 66 n.28. The same goes for any other "later history" that "contradicts what the text says," because " 'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional

text obviously cannot overcome or alter that text.' " *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).It follows that all of Defendants' proffered analogues hailing from well after 1791—most from the *mid to late 1800s*—necessarily fail as valid comparisons right out of the gate, regardless of any substantive similarity that they might otherwise possess. *See Bruen*, 597 U.S. at 82 (Barrett, J., concurring) ("[I]f 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late…"). This includes all the purported analogues cited in Defendants' brief involving: Bowie Knives, Def. Brf. at 18-20 (citing laws and regulations enacted between 1837 and 1881); "Clubs and Other Blunt Weapons," *id.* at 20 (citing laws enacted between 1862 and "the early 1900s"); and "Toy Guns," *id.* (citing laws enacted between "the 1880s and early 1900s," "the 1930s," and up to 1955). A look behind the scenes at the expert report underlying the rendition of laws in the brief, Dkt. No. 42-2, only highlights the general tardiness problem: virtually all of the listed laws concerning these instruments come no earlier than the mid-1800s and many come much later in time, *see* Exhibits B and D to Dkt. No. 42-2 at 83-86, 92-95, 98, 102, 106-07, 109, 112-18, 121-22, 124, 126-131, 136, 138-142, 144-45, 151-52, 155-59, 162-66, 169-171, 175-76, 179, 182-83, 186, 190, 193-94 (listing laws enacted between 1799 and 1927, the vast majority of which were enacted between 1837 and 1898, and most from the late 1800s, with the exception of a single law from 1774).[3]

Further, as detailed below, besides being too late, these all fail for lack of relevant similarity under *Bruen*. And the fundamental lack of similarity across the entire period between 1791 and

---

[3] Of course, a single or small number of laws cannot establish any "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 46 ("We doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."); *id.* at 67-68 (quoting *Heller*, 554 U.S. at 632) (rejecting "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence").

1868 seals the fate of the bans regardless of the timing issue. Thus, while the Second Circuit recently applied to a state law the principle that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," *Antonyuk v. Chiumento*, 89 F.4th 271, 304 (2d Cir. 2023), it qualified this principle with the "observ[ation] that if the relevant period extends beyond the Founding era, 'then Founding-era regulations remain instructive *unless contradicted by something specific* in the Reconstruction-era,' " *id.* at 305 (quoting *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 112 (3d Cir. 2023) (en banc) (Ambro, J., concurring) (emphasis added)). Nothing more "specific," much less "relevantly similar" ever appears across the span of time. Rather, the public understanding of the right" at stake "in both 1791 and 1868 was, for all relevant purposes, the same . . ." *Bruen*, 597 U.S. at 38.

### C.    Defendants' Purported Analogues

At the outset, it bears emphasis that Defendants' historical analysis is built around a constitutionally untenable construct that sets the bar for "relevantly similar" low enough to evade the actual requirements of *Bruen* with virtually any purported analogy to a historical regulation. Again, in Defendants' alternate universe, it's enough that the challenged law and proffered analogue track follow the generic pattern of restricting arms that are produced, circulated, and eventually prompt the enactment of a regulatory scheme designed to curb their misuse. In the real world, any such yardstick for measuring relevant similarity falls far short of the constitutional mark, because we must focus on the historically-rooted question of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. From that perspective, it is clear that Defendants cannot carry their burden to justify these bans. Indeed, at most Defendants have confirmed what *Heller* already held—only dangerous and unusual arms can be banned.

### 1. **Bowie Knives**

The first set of laws that Defendants cite is a batch of nineteenth century regulations restricting the carry, sale, or possession of Bowie knives in jurisdictions that classified such knives as "deadly weapons" at the time. Def. Brf. at 18-20. The "how and why" of any such laws are not and cannot be comparable. The weapons targeted by Defendants' bans are neither "dangerous" nor "unusual"—much less *both* "dangerous and unusual" so as to be subject to any kind of *constitutionally valid* weapons ban. *Heller*, 554 U.S. at 627. The targeted arms are not subject to *general* prohibitions rendering them broadly unlawful to carry, sell, or possess, because they are in common use for lawful purposes. The simple but fundamental fact is, just as colonial laws that "prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s" could "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today," laws from the mid to late nineteenth century that may have prohibited the sale, carry, or possession of certain weapons deemed "dangerous" can provide no justification for Defendants' total ban against the stun guns and tasers that are also "unquestionably in common use today." *Bruen*, 597 U.S. at 47.

And, in fact, Defendants mischaracterize the record to the extent they suggest the existence of any *tradition* of outright banning Bowie knives or even that any significant number of laws during the relevant period went so far as to impose such general prohibitions. Based on their own submissions, Dkt. No. 42-2, Exhibits B & D, at 83-86, 92-194, between 1791 and 1868, <u>no</u> states that adopted laws that prohibited the carry of Bowie knives in any manner (i.e. open or concealed). And, between 1868 and the close of the nineteenth century, only <u>three</u> states adopted such laws:

Arkansas (1875); Texas (1871); and West Virginia (1882).[4] Further, only six states adopted laws that prohibited the *concealed* carry of Bowie knives and other weapons during the period 1791 to 1868: Alabama (1839); Georgia (1837); Louisiana (1855); Ohio (1859); Tennessee (1838); and Virginia (1838),[5] along with three territories: Colorado (1862); Montana (1864); and New Mexico (1853).[6] During the period from 1868 to the end of the century, a handful of other states and territories enacted such regulations, but again only as to *concealed* carry.[7]

Moreover, Defendants' own characterization of these laws highlights the major disconnect between them and the challenged bans: as they describe it, these laws were primarily intended to protect law-abiding citizens from "terror," "destruction of human life," and "weapon-fueled violence" wielded by "desperados" and evildoers. Def. Brf. at 18-20. Here, of course, we are dealing with bans that broadly impose their prohibitions against all ordinary citizens, including *law-abiding* citizens like Plaintiffs, subjecting them to criminal prosecution and sanction for possessing or using any of the targeted arms for *lawful* purposes including self-defense. Notably too, quite unlike Defendants' bans that impose their prohibitions without any meaningful exception for ordinary law-abiding citizens, these laws had self defense-oriented exceptions. For example, the Arkansas and Texas laws that Defendants cite provided exceptions for individuals "on a

---

[4]  *See* 1874-75 Ark. Acts 156, §1; 1871 Tex. Laws 25, §1; 1882 W. Va. Acts 421–22; Doc. No. 42-2 pp. 100, 180, 190. The table contained in Exhibit B of Defendants' expert report incorrectly states this law was adopted in 1881. *See* Doc. No. 42-2 p. 84.

[5]  *See* 1839 Ala. Acts 67, §1; 1837 Ga. Acts 90, §§1–4; 1855 La. L. Chap. 120, Sec. 115; 1859 Ohio Laws 56, §§1-2; 1837-38 Tenn. Pub. Acts 200-01, ch. 137, §2; 1838 Va. Acts ch. 101, at 76; Doc. No. 42-2 pp. 94, 114-15, 126, 164, 175-76, 186.

[6]  *See* 1862 Colo. Sess. Laws 56, §1; 1864 Mont. Laws 355, §1; 1853 N.M. Laws 406, §25; Doc. No. 42-2 pp. 106, 143, 155. Note that Exhibit B omits reference to the 1853 New Mexico law and instead refers only to a similar law enacted in 1859. *See* Doc. No. 42-2 pp. 85, 155-56.

[7]  *See* 1893 Ariz. Sess. Laws 3, §1; Dist. of Col., An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, Ch. XXV; John Prentiss Poe, The Maryland Code (1888), Concealed Weapons, §30; 1891 Mich. Pub. Acts 409; 1878 Miss. Laws 175, §1; 1883 Mo. Laws 76, §1274; N.C. Sess. Laws (1879) ch. 127, §1; 1893 R.I. Pub. Laws 231, ch. 1180, §1; 1870 W. Va. Code 692, ch. 148, §7; Doc. No. 42-2 pp. 98, 109, 130-31, 136, 139-40; 141, 163, 170-71, 190.

journey" or "traveling," respectively.[8] And, both the Texas and West Virginia laws provided a defense for someone who showed (in substance) that they feared danger and acted reasonably.[9]

Any regulations that imposed "taxes on individuals' acquisition or possession" of Bowie knives, Def. Brf. at 19, obviously also offer nothing in the way of relevant similarity in the "how" or the "why" of their regulatory purpose: again, here we are dealing with an outright ban on the acquisition and possession of the targeted arms, not just a *tax* on their purchase or use.

### 2.  Clubs and Other Blunt Weapons

The second set of laws Defendants cite as purported analogues concern regulations enacted between the late 1800s and early 1900s concerning "harmful implements," like "bludgeons, billy clubs, slungshots, and sandbags." Def. Brf. at 20. Besides simply being too late in time to matter, as with the regulations on Bowie knives, Defendants' own characterizations of these laws readily preclude fair comparisons: they highlight how these laws placed restrictions on the "manufacture," "possession," "sale," "carry," or "use in crime" of these weapons. *Id.* But again, any broad restrictions on these weapons, even if considered valid then, can provide no justification for Defendants' total ban against the targeted stun guns and tasers that are "unquestionably in common use today" and thus are not "dangerous and unusual." *Bruen*, 597 U.S. at 47. Like with the regulations on Bowie knives, this difference alone sets aside the entire category of such restrictions under the "central considerations" of the historical inquiry. *Bruen*, 597 U.S. at 47. And, being *law-abiding* citizens seeking to use these arms for lawful purposes, the bans can in no way compare to any historical laws that were aimed at penalizing individuals for using weapons "in crime."

Indeed, many of these laws regulating "harmful implements" were tailored to simply penalize the criminal use of these weapons by punishing their carry or use with the intent to assault

---

[8]      *See* 1881 Ark. Acts 191, ch. 96, §§1-2; 1871 Tex. Laws 25, §1; Doc. No. 42-2 pp. 101, 180.
[9]      *See* 1871 Tex. Laws 25, §2; 1882 W. Va. Acts 421–22; Doc. No. 42-2 pp. 180, 190.

or injure another: e.g., California (1853); Colorado (1876); Georgia (1816); Idaho (1875); Illinois (1845); Maryland (1809, 1886); Montana (1887); Nebraska (1858); New Jersey (1799); and Wyoming (1876).[10] And here, by contrast, Defendants' bans broadly target all ordinary citizens, including law-abiding citizens like Plaintiffs, regardless of how lawful their purposes may be.

### 3.   Toy Guns

The last set of purported analogues—coming *very* late in the game—are laws enacted between the late 1800s and the mid 1900s concerning "toy guns" in jurisdictions that restricted their manufacture, sale, carry, or transfer to others as "dangerous" devices. Def. Brf. at 21. To whatever degree such devices can or should be considered "arms" under the Second Amendment for purposes of drawing proper historical analogues, again, no such comparison can be made here with protected arms that are neither dangerous nor unusual so as to be subject to any total ban. Moreover, relying on their expert report, Defendants contend that "[b]etween the 1880s and early 1900s, at least 31 states enacted anti-toy gun laws." Def. Brf. at 21. The expert, in turn, explains that his "research" has identified the 31 states by going to a website and typing in the search term "toy." *See* Doc. No. 42-2 p. 26 & n.2. The report does not cite or provide copies of any of the purported laws, let alone any description of how the "anti-toy" laws operated, or why they are relevant analogues here. Thus, Defendants do not even provide an evidentiary foundation for their claim that the "how" or the "why" of these laws should be considered "relevantly similar."

---

[10] *See* Compiled Laws of California (1853), §127; 1876 Colo. Sess. Laws 304, General Laws, §154; Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia (1821), Offences Against the Public Peace §19; Compiled and Revised Laws of the Territory of Idaho (M. Kelly, Territorial Printer 1875), Crimes and Punishments §133; Mason Brayman, Revised Statutes of the State of Illinois (1845), Criminal Jurisprudence, §139; The Laws Of Maryland (1811) 465; John Prentiss Poe, The Maryland Code (1888) Concealed Weapons, §30; Doc. No. 42-2 pp. 130-31; 1887 Mont. Laws 549, Criminal Laws, §174; 1858 Neb. Laws 69, §135; Charles Nettleton, Laws of the State of New-Jersey (1821), An Act to Describe, Apprehend and Punish Disorderly Persons (1799), §2; Wyo. Comp. Laws (1876), ch. 35 §127; Doc. No. 42-2 pp. 102, 106, 114, 116-17, 117-18, 128-29, 144, 151, 193. There is also a California law from 1849, four years earlier, that prohibiting the carry of weapons with "intent to assault," but only in the City of San Francisco. *See* 1849 Cal. Stat. 245, §127; Doc. No. 42-2 p. 102.

### D.       Defendants' Reliance on Improper Opinions Underscores the Problem

Defendants attempt to bridge the evidentiary gap with improper expert opinions that purportedly draw legal conclusions on the key points they fail to establish on their own. They cite their experts for opinions that the historical regulations proffered as analogues are " 'remarkably analogous to contemporary restrictions on stun guns and tasers,' " Def. Brf. at 2 (quoting Schonfeld Dec., Ex. B at 10), "[t]he regulation of 'less-lethal' non-firearm weapons associated with criminal activity throughout American history demonstrates that such weapons were subject to significant, widespread, and varied regulation 'remarkably similar to that of stun guns and tasers,' " *id.* at 18 (quoting Schonfeld Dec., Ex. B at 10), "[i]t is clear from the above historical analysis that all of the weapons discussed herein—including tasers, stun guns, bowie knives, clubs, and toy guns— 'follow a nearly identical regulatory pattern,' " *id.* at 21 (quoting Schonfeld Dec., Ex. B at 26), and " '[i]n short, the history of these devices, when considered in the light of historical non-firearm regulations in American history . . . . militates in favor of the current legal restrictions in New York,' " *id.* at 21 (quoting Schonfeld Dec., Ex. B at 27).

"We have consistently held, in that respect, that expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it,' [citation], by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's,' [citation]." *Nimley v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). "Thus, although an expert may give an opinion to help the jury decide an issue in the case, he or she may not tell the jury what result to reach," *In re Rezulin Products Liability Litigation*, 309 F.Supp.2d 531, 541 (S.D.N.Y. 2004) (citing *United States v. Duncan*, 42 F.3d 97, 100 (2d Cir.1994), "or communicate 'a legal standard—explicit or implicit—to the jury,' " *id.* (quoting *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir.1992)). Accordingly, while "factual

-24-

conclusions on an ultimate issue to be decided by the jury are permissible," "[t]his principle requires the exclusion of testimony that states a legal conclusion." *Id.* The expert opinions on which Defendants rely here, in the hopes of carrying their burden, patently violate this principle.

That Defendants must resort to such improper strategies speaks volumes by itself. Simply put, like their attempts to water down the requirements of *Bruen* by engineering fake standards, this litigation maneuvering reveals that they cannot carry the actual burden. And so, we come full circle to the conclusion that was apparent at the very beginning when Defendants concocted a distorted textual analysis in an attempt to dodge scrutiny under *Bruen's* historical analysis: there *is* no legitimate justification for Defendants' bans against the protected arms that they seek to banish based on nothing more than their own policies choices that they wish to elevate above all else. But "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). "It is this balance—struck by the traditions of the American people—that demands our unqualified deference," and it is this balance that entitles the "law-abiding, responsible citizens" of the City and State of New York to own, possess, and use stun guns and tasers for self-defense and other lawful purposes *without* fear of criminal prosecution under bans that are entirely *in*consistent with this Nation's history of firearms regulation. The relief Plaintiffs seek through this action is necessary to secure that right.

## IV)    CONCLUSION

The Court should enjoin enforcement of the prohibitions on "electronic stun guns" and "electronic dart guns" contained in New York Penal Law §265.01(1) and New York City Administrative Code §10-135.

Dated: New York, New York
       June 6, 2024

                    DAVID JENSEN PLLC


                    By: _____
                        David D. Jensen, Esq.