UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; AMANDA KENNEDY; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC.,<br><br>      Plaintiffs,<br><br> -against-<br><br>CITY OF NEW YORK; and EDWARD A. CABAN, in his official capacity as Commissioner of the New York City Police Department,<br><br>      Defendants. | No. 1:21-cv-08208-ER |

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' LOCAL RULE 56.1 STATEMENT**

  Plaintiffs, pursuant to Rule 56(c) and Local Civil Rule 56.1, respond to Defendants'

Local Rule 56.1 Statement as follows:

1. Plaintiff Nunzio Calce lives in Bronx, New York and would like to buy and possess a stun gun and taser to protect himself and his family both at home and in public. See Declaration of Nunzio Calce, dated February 29, 2024, ¶¶ 2, 3.

  RESPONSE: Not disputed.

2. Plaintiff Allen Chan lives in Flushing, New York and would like to buy and possess a stun gun and taser to protect himself both at home and in public. See Declaration of Allen Chan, dated February 27, 2024, ¶¶ 2, 3.

  RESPONSE: Not disputed.

3. Plaintiff Shaya Greenfield lives in Richmond Hill, Queens and would like to buy and possess a stun gun and taser to protect himself both at home and in public. See Declaration of Shaya Greenfield, dated February 29, 2024, ¶¶ 2, 3.
[Amended Complaint (Doc. No. 5) ¶ 13; Answer (Doc. No. 15) ¶ 13]

  RESPONSE: Not disputed.

4.     Plaintiff Raymond Pezzoli lives in Staten Island, New York and would like to buy and possess a stun gun and taser to protect himself both at home and in public. See Declaration of Raymond Pezzoli, dated February 29, 2024, ¶¶ 2, 3.

    RESPONSE:   Not disputed.

5.     Plaintiff Amanda Kennedy lives in Bristol, Connecticut but previously resided in Brooklyn, New York. See Declaration of Amanda Kennedy, dated February 29, 2024 ("Kennedy Dec.") ¶ 2.

    RESPONSE:   Not disputed.

6.     On November 16, 2021, Plaintiff Kennedy was charged with possessing a stun gun in violation of New York City Administrative Code § 10-135. See Kennedy Dec., ¶¶ 3-4.

    RESPONSE:   Not disputed.

7.     On December 6, 2021, the Kings County Criminal Court issued Plaintiff Kennedy an adjournment in contemplation of dismissal. See Kennedy Dec., ¶ 7.

    RESPONSE:   Not disputed.

8.     Plaintiff Second Amendment Foundation ("SAF") is a not-for-profit corporation that is organized under the laws of the State of Washington with its principal place of business located in Bellevue, Washington. See Declaration of Adam Kraut, dated March 1, 2024, ¶ 2.

    RESPONSE:   Not disputed.

9.     Plaintiff Firearms Policy Coalition, Inc. is a nonprofit membership organization that is organized under the laws of the State of Delaware with its principal place of business located in Clark County, Nevada. See Declaration of Brandon Combs, dated March 1, 2024, ¶ 2.

    RESPONSE:   Not disputed.

10.     Defendant, City of New York, is a municipal corporation incorporated under the laws of the State of New York. See Defendants' Answer (Doc. No. 15), ¶ 13.

    RESPONSE:   Not disputed.

11.     Defendant Dermot Shea, who is being sued in his official capacity, was the Commissioner of the New York City Police Department ("NYPD") at the time that this action was filed in 2021. See Defendants' Answer (Doc. No. 15), ¶ 15.

    RESPONSE:   Not disputed.

12. Edward Caban is the current Commissioner of the NYPD. See https://www.nyc.gov/site/nypd/about/leadership/commissioner.page

    RESPONSE:  Not disputed.

**Challenged Provisions of Law**

13. In this action, Plaintiffs challenge the constitutionality of New York State Penal Law ("Penal Law") Section 265.01 and New York City Administrative Code ("Administrative Code") Section 10-135. See Plaintiffs' Statement of Undisputed Facts, ¶¶ 39, 40.

    RESPONSE:  Not disputed.

14. Penal Law § 265.01 was adopted in 1974. See Declaration of Samantha Schonfeld, dated April 26, 2024 ("Schonfeld Dec."), Ex. C.

    RESPONSE:  Plaintiffs do not dispute that the legislature adopted Penal Law § 265.01 in 1974, but note that the 1974 enactment did not address electronic dart guns or electronic stun guns.

15. Penal Law § 265.01 prohibits the possession of any electronic dart gun or electronic stun gun and provides as follows:

    > Section 265.01—Criminal Possession of a weapon in the fourth degree
    >
    > A person is guilty of criminal possession of a weapon in the fourth degree when:
    >
    > > (1)   He or she possesses any firearm, electric dart gun, electric stun gun, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken, or "Kung Fu star"…
    >
    > Criminal possession of a weapon in the fourth degree is a Class A misdemeanor.

    See Schonfeld Dec., Ex. C.

    RESPONSE:  Not disputed.

16. Administrative Code § 10-135 prohibits the possession and sale of electronic stun guns and provides as follows:

    > § 10-135 Prohibition on sale and possession of electronic stun guns
    >
    > > a. As used in this section, "electronic stun gun" shall mean any device designed primarily as a weapon, the purpose of which is to stun, render unconscious or paralyze a person by passing an electronic shock to such person, but shall not include an "electronic dart gun" as such term is defined in § 265.00 of the penal law.

    b. it shall be unlawful for any person to sell or offer for sale or to have in his or her possession within the jurisdiction of the city any electronic stun gun.

    c. Violation of this section shall be a Class A misdemeanor…

See Schonfeld Dec., Ex. D.

RESPONSE: Not disputed.

17. Administrative Code § 10-135 was adopted in 1985. See Schonfeld Dec., Ex. D.

RESPONSE: Not disputed.

**Stun Guns and Tasers**

18. An electronic stun gun is defined as "any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, render unconscious or paralyze a person by passing a high voltage electrical shock to such person." See Penal Law § 265.00 15(c); Declaration of Artur Edward Sadowksi, dated April 26, 2024 ("Sadowski Dec."), ¶ 4.

RESPONSE: Not disputed.

19. Stun guns require direct contact between the device and an individual. See Sadowski Dec., ¶ 4.

RESPONSE: Not disputed.

20. An electronic dart gun or "Taser" as it is commonly referred, is defined as "any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical current to such person by means of a dart or projectile." See Penal Law § 265.00 15(a); Sadowski Dec., ¶ 5.

RESPONSE: Not disputed.

21. Tasers incapacitate individuals by transmitting pulses of electric current. See Sadowski Dec., ¶ 6.

RESPONSE: Not disputed.

22. Tasers fire two small darts that are connected to the device with wires. See Sadowski Dec., ¶ 6.

RESPONSE: Not disputed.

23. Tasers were first developed in the 1960s and 1970s to be used by law enforcement as a less-lethal option to firearms. See Schonfeld Dec., Ex. B at 5-6.

    RESPONSE: Disputed, but admitted that tasers were first patent application for a taser device was filed in 1970 and that one use of tasers was in law enforcement. According to US Patent 3,803,463, the original intended use was "for the self-protection of the private citizen, as well as an important element in the armamentarium of the armed forces and law enforcement agencies."

24. Between 1970 and the early 2000s, seven states, including New York, enacted laws banning civilian possession of stun guns and tasers. See Schonfeld Dec., Ex. B at 6.

    RESPONSE: Not disputed.

25. Approximately 40 localities within 15 states enacted similar restrictions on the banning of civilian possession of stun guns and tasers. See Schonfeld Dec., Ex. B at 6-7.

    RESPONSE: Not disputed.

26. Approximately 17 states and "nearly 130 localities" imposed carry bans on stun guns and tasers. See Schonfeld Dec., Ex. B at 7.

    RESPONSE: Denied, but admitted that, according to the law review article cited in the proffered expert report: (1) two states (Connecticut and Oklahoma) adopted bans on carrying stun guns and tasers either openly or concealed; (2) one state (Illinois) adopted a ban on carrying either openly or concealed, unless one holds a license; (3) within these three states, four localities in Illinois and 14 localities in Oklahoma banned carry either openly or concealed; and (4) outside of these three states, 14 localities adopted laws that banned carry either openly or concealed. *See* Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life*, 62 STAN.L.REV. 199, 247-49 (2009). The other laws referenced in the article restricted concealed carry, and more specifically: (1) two states (Delaware and Maryland) adopted laws that prohibit or appear to prohibit concealed carry and one state (Wisconsin) may have done so; and (2) nine states (Louisiana, Maine, Michigan, Missouri, Nebraska, North Carolina, Ohio, South Carolina and Utah) adopted laws that prohibit or appear to prohibit concealed carry unless one holds a license, and one state (Washington) may have done so. *See id.* at 249-54.

27. Sometime in the 1990s, tasers were removed from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives "firearm" category. See Schonfeld Dec., Ex. B at 7.

    RESPONSE: Denied, but admitted that the Bureau of Alcohol, Tobacco, Firearms and Explosives determined that tasers were firearms in 1976 (ATF Ruling 76-6) and that in 1990 tasers were released that used compressed air instead of gas, with the result that they no longer met the definition of firearm.

28. Improper use of stun guns and tasers can result in serious injury, including death. See Sadowski Dec., ¶ 7.

    RESPONSE:  Not disputed.

29. Tasers and stun guns have been "used by criminals to intimidate and even torture victims." See Schonfeld Dec., Ex. B at 27.

    RESPONSE:  Disputed. The cited page of the proffered expert witness report does not contain any source or citation for this conclusion. It is not disputed that all weapons are capable of being used by criminals.

30. Between 2010 and 2021, "at least 513 individuals died in the U.S. as the result of being fired upon with tasers by police." See Schonfeld Dec., Ex. B at 7.

    RESPONSE:  Denied, but admitted that the USA Today article cited in the expert report states: "Since 2010, there have been at least 513 cases in which subjects died soon after police used Tasers on them, according to fatalencounters.org."

31. From 2000 through 2020 "tasers were the third leading cause of death among fatalities resulting from civilian-police encounters." See Schonfeld Dec., Ex. B at 7-8.

    RESPONSE:  Not disputed.

**Historical Regulations on Non-Firearm Weapons**

   **A. Bowie Knives**

32. In the 1800s, 29 states enacted laws banning the concealed carrying of Bowie knives. See Schonfeld Dec., Ex. B at 18.

    RESPONSE:  Plaintiffs object that this statement relates to the analysis of history as it informs the meaning of the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 25 n.6 (2022) ("The job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (*quoting* W. Baude & S. Sachs, *Originalism and the Law of the Past,* 37 L. & HIST. REV. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Furthermore, the cited laws speak for themselves and are their own best evidence as to what they did and did not permit and Plaintiffs deny to the extent that the statement misconstrues the laws. Subject to those objections, denied. The following states (and the District of Columbia) adopted laws that prohibited the concealed carry of Bowie knives during the 1800s in the dates indicated: Alabama (1839); the District of Columbia (1871); Georgia (1837); Louisiana (1855); Maryland (1886); Michigan (1891); Mississippi (1878); Missouri (1883); North Carolina (1879); Ohio (1859); Rhode Island (1893); Tennessee (1838); Virginia (1838); and West Virginia (1870). In addition, five territories

    adopted laws that prohibited concealed carry in the dates indicated: Arizona (1893); Colorado (1862); Montana (1864); and New Mexico (1853). The balance of the laws cited in the proffered expert witness report are municipal laws, not state laws. *See* pages 104, 118-19, 121-24, 137-38, 144-45, 154, 170, 192-93 of Doc. No. 42-2.[1]

33.    Fifteen states barred both open and concealed carry of Bowie knives. See Schonfeld Dec., Ex. B at 18.

    RESPONSE:   Subject to the same objections as Statement 32, Plaintiffs deny. Only three of the state laws the State identified banned both open and concealed carry of Bowie knives: Arkansas (1875); Texas (1871); West Virginia (1882). In addition, three territories adopted laws that prohibited both open and concealed carry: Arizona (1889), Hawaii (1852) and Oklahoma (1890). Such laws are not "state laws" as the State asserts, and *Bruen* discounted territorial laws because they were frequently short lived, rarely tested in court, and irrelevant to most of the country at the time they were in force. *Bruen*, 597 U.S. at 67-68.

    Two of the cited laws (from Colorado in 1881 and Indiana in 1859) prohibited concealment, not carry in any manner. *See* Doc. No. 42-2 pp. 107, 120. One of the cited laws (from New York in 1885) prohibited the carry or possession of a "dirk or dangerous knife" only where there was "intent to use [it] against another." *See id.* at 158. The Vermont law from 1892 similarly applied only where there was proof someone carried a weapon "with the intent or avowed purpose of injuring a fellow man," or alternatively, while at a school. *See id.* at 183. And finally, Louisiana's 1870 law applied only on election day, while Tennessee's 1869 law prohibited carrying Bowie knives, guns and other weapons only in specific areas—elections, fairs, race courses and other public assemblies. *See id.* at 126-27, 178. The balance of the cited laws are municipal laws, not state laws. *See id.* at 84-86, 117, 142, 144, 158-59, 179, 182-83.

34.    Seven states created enhanced criminal penalties for individuals who used Bowie knives to commit criminal offenses. See Schonfeld Dec., Ex. B at 19.

    RESPONSE:   Subject to the objections above, admitted in part. The seven laws the State's expert cites also enhance criminal penalties for those carrying a pistol or a rifle, among other weapons. They do not single out Bowie knives. *See* Schonfeld Dec., Ex. D at 9, 11, 22, 27, 39, 63, 80.

35.    Four states "enacted penalties for brandishing Bowie knives." See Schonfeld Dec., Ex. B at 19.

    RESPONSE:   Subject to the objections above, denied, these penalties were enacted for brandishing weapons in a "rude" or "threatening" manner. *See* Schonfeld Dec., Ex. D at

---

[1] Both in this response and in the briefing submitted herewith, Plaintiffs refer to the actual page numbers of the .pdf document filed as No. 42-2 on the ECF docket for the convenience of the Court. Plaintiffs do not intend the references to concede that the historical record is complete, nor to suggest that the question presented here—a complete prohibition on a nonlethal weapon—requires a detailed analysis of the historical record.

12, 27, 48, 50. These laws prohibit the crime of affray and do not ban the weapons in question.

### B. Clubs and Other Blunt Weapons

36.  Every state in the United States had laws "restricting one or more types of clubs." See Schonfeld Dec., Ex. B at 20.

   RESPONSE: Subject to the objections above, denied. The State's expert's descriptions are far too general to satisfy the careful review which *Bruen* requires. The State's expert admits that "[m]ost were anti-carry laws". See Schonfeld Dec., Ex. B at 20. As examples, Spitzer cites two 20th century laws, 1917 Cal. Sess. Laws 221-225 and 1923 Cal. Stat. 695. Not only do these laws come far too late to be relevant to the *Bruen* analysis, but California's 1917 ban on billy clubs has been declared to be in violation of the Second Amendment. *See Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024).

37.  Fifteen states prohibited bludgeon carrying. See Schonfeld Dec., Ex. B at 21.

   RESPONSE: Subject to the objections above, denied. Two states adopted laws that prohibited the concealed carry of Bowie knives in the 1800s: Michigan (1887) and Rhode Island (1893). *See* Doc. No. 42-2 at pp. 136, 170-71. In addition, two states adopted laws that banned the carry of bludgeons and other weapons either open or concealed in the dates indicated: Oklahoma (1890) and West Virginia (1882). *See id.* at 165-66, 190.

   Otherwise, ten states and territories adopted laws in the 1800s that prohibited carrying bludgeons and other weapons "*with intent to assault another.*" These were not general prohibitions on carrying bludgeons. *See id.* at 102, 106, 114, 116-17, 117-18, 128-29, 144, 151, 193. Maryland adopted two laws (in 1874 and 1886) that restricted the carry of bludgeons and other weapons, but these laws applied only on election day in two counties. *See id.* at 129.

38.  Sixteen states created anti-billy club laws. See Schonfeld Dec., Ex. B at 22.

   RESPONSE: Subject to the objections above, denied. The description of the laws as "anti-billy club laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Two of the cited state laws merely prohibited the concealed carry of billy clubs and other weapons on the dates indicated: Michigan (1887) and Rhode Island (1893). *See* Doc. No. 42-2 pp. 136, 170-71. Furthermore, two other states adopted laws that prohibit the open or concealed carry of billy clubs and other weapons on the dates indicated: Oklahoma (1890) and West Virginia (1882). *See id.* at 165-66, 190. Furthermore, Maryland adopted laws that prohibited concealed carry of billy clubs in two counties in 1872 and 1886, and the 1874 and 1886 Maryland election day carry prohibition (no. 37 above) also applied to billy clubs. *See* Doc. No. 42-2 pp. 129-30. Aside from that, the remainder of the "anti-billy club" laws (from before the twentieth century) are municipal laws that, by and large, prohibited the *concealed* carry of various weapons, including billy clubs.

39. Forty-three states enacted anti-slungshot laws. See Schonfeld Dec., Ex. B at 22.

   RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-slungshot laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29.  Only four states completely banned slungshots. *See Teter v. Lopez*, 76 F.4th 938 (August 7, 2023) at 951. The balance of the cited laws are municipal laws, not state laws; the State's expert has been previously criticized for conflating state and municipal laws. *See Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024) at *10 ("It makes it difficult to properly perform the *Bruen* analysis when the State's expert who has studied gun regulations for thirty years is imprecise in his language, and when the State's briefing employs a mischaracterization. After all, the subject of the regulatory 'what and when' is the central historical tradition inquiry under *Bruen*. More importantly, it is the government's central burden to show a national tradition of regulation by reference to state laws and court decisions in effect during the most important historical time period.").

40. In the 1800s and early 1900s, 10 states enacted anti-sandbag laws. See Schonfeld Dec., Ex. B at 23-24.

   RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-sandbag laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. The only states that banned sandbags were California (1923) (*see* Schonfeld Dec., Ex. D at 14); Michigan (1927, 1929) (*see id.* at 46); New York (1913, 1931) (*see id.* at 69); and Oregon (1917) (*see id.* at 78). All of these bans come from the 20th century, and as a result are irrelevant to the *Bruen* analysis. *See Bruen*, 597 U.S. at 66 n. 28.

   **C. Toy Guns**

41. In the 1880s, at least 19 states enacted anti-toy gun laws. See Schonfeld Dec., Ex. B at 26.

   RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-toy gun laws" without specifying what they prohibited is insufficiently descriptive to even permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Vermont adopted a law that prohibited the sale of (or possession with intent to sell) "a toy pistol for the explosion of percussion caps or blank cartridges." *See* Doc. No. 42-2 p. 26 & n.103. Otherwise, Defendants have not provided copies of these alleged laws, and the only citations in the proffered expert report are to the URL of a searchable database and an article identified as: Carberry, "The Origin of Toy Guns in America". *See id.* at 26 & nn.102, 104.

42. Between the 1800s and early 1900s, 31 states enacted anti-toy gun laws. See Schonfeld Dec., Ex. B at 26.

   RESPONSE:   Subject to the objections above, denied. The description of the laws as "anti-toy-gun laws" without specifying what they prohibited is insufficiently descriptive to even

permit a response and it lumps together laws that are not "relevantly similar" even to one another. *See Bruen*, 597 U.S. at 29. Vermont adopted a law that prohibited the sale of (or possession with intent to sell) "a toy pistol for the explosion of percussion caps or blank cartridges." *See* Doc. No. 42-2 p. 26 & n.103. Otherwise, Defendants have not provided copies of these alleged laws, and the only citations in the proffered expert report are to the URL of a searchable database and an article identified as: Carberry, "The Origin of Toy Guns in America". *See id.* at 26 & nn.102, 104.

43. In 1995, New York City "banned black, blue and silver toy guns." See Schonfeld Dec., Ex. B at 26.

    RESPONSE:   Not disputed.

Dated:  New York, New York
        June 6, 2024

                                        DAVID JENSEN PLLC


                                        By: _____
                                            David D. Jensen, Esq.