UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUNZIO CALCE; ALLEN CHAN; SHAYA GREENFIELD; RAYMOND PEZZOLI; SECOND AMENDMENT FOUNDATION; FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF NEW YORK and DERMOT SHEA as the Commissioner of the New York City Police Department, <br><br> Defendants. | 21-CV-8208 (ER) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the
 City of New York
Attorney for Defendants
100 Church Street
New York, NY 10007
Tel: (212) 356-2183

Michelle Goldberg-Cahn
Nicholas Ciappetta
Samantha Schonfeld
  *of Counsel*

July 26, 2024

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT .......................................................................................................................... 2

    POINT I

        DEFENDANTS' SECOND AMENDMENT ANALYSIS IS CONSISTENT WITH BRUEN AND SECOND CIRCUIT CASE LAW ..................................................2

    POINT II

        DEFENDANTS HAVE SUCCESSFULLY DEMONSTRATED THAT THE REGULATION OF STUN GUNS AND TASERS IS RELEVANTLY SIMILAR TO THE HISTORICAL TRADITION OF THE REGULATION OF OTHER NON-FIREARM WEAPONS IN THE UNITED STATES ..................................................7

CONCLUSION ...................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

Avitabile v. Beach,
   368 F. Supp. 3d 404 (N.D.N.Y. 2019)...................................................................................4, 5

Caetano v. Massachusetts,
   577 U.S. 411 (2016)..................................................................................................................4

Grant v. Lamont,
   No.: 3:22-cv-01223(JBA) 2023 U.S. Dist. LEXIS 151015
   (D. Conn. Aug. 28, 2023) .....................................................................................................3, 5

Knight v. City of New York,
   22-civ-10755 (VEC)(VF), 2023 U.S. Dist. LEXIS 213426
   (S.D.N.Y. Nov. 20, 2023) ........................................................................................................4

Lane v. Rocah,
   No. 22-cv-10989(KMK), 2024 U.S. Dist. LEXIS 1839
   (S.D.N.Y. Jan. 4, 2024).............................................................................................................3

Maloney v. Singas,
   351 F. Supp. 3d 222 (E.D.N.Y. 2018) .....................................................................................5

Mintz v. Chiumento,
   No. 23-cv-795, 2024 U.S. Dist. LEXIS 61699 (N.D.N.Y. Mar. 20, 2024) ..............................3

N.A. for Gun Rts. v. Lamont,
   No. 3:22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880
   (D. Conn. Aug. 3, 2023) ...........................................................................................................3

New York State Rifle & Pistol Ass'n v. Bruen,
   142 S. Ct. 2111 (2022).............................................................................1, 2, 3, 4, 5, 6, 7, 12

New York State Rifle & Pistol Ass'n v. Bruen,
   597 U.S. 1 (2022).............................................................................................1, 4, 7, 8, 11, 12

New York State Rifle & Pistol Ass'n v. Cuomo,
   804 F.3d 242 (2d Cir. 2015).....................................................................................................4

People v. Yanna,
   297 Mich. App. 137 (Ct. App. 2012).......................................................................................4

Srour v. New York City,
   22-civ-JPC, 2023 U.S. Dist. LEXIS 190340 (S.D.N.Y. Oct. 24, 2023) ...................................4

| **Cases** | **Pages** |
| --- | --- |

Steven Rupp et al v. Bonta,
  No.: 8:17-cv-00746-JLS-JDE, 2024 U.S. Dist. LEXIS 46430
  (C.D. Ca. Mar. 15, 2024) .................................................................................................3, 5, 7

United States v. Berger,
  No. 5:22-cr-00033, 2024 U.S. Dist. LEXIS 20259
  (E.D. Pa. Feb. 5, 2024)........................................................................................................3, 5

United States v. Herriott,
  No. 23-cr-37, 2024 U.S. Dist. LEXIS 110555
  (N.D. Ind. June 24, 2024) ......................................................................................................8

United States v. Rahimi,
  219 L. Ed. 2d 351 (2024) ...........................................................................7, 8, 9, 10, 12, 13

Vt. Fed'n of Sportsmen's Clubs v. Birmingham,
  2:23-cv-710, 2024 U.S. Dist. LEXIS 126857
  (D. Vt. July 18, 2024) ........................................................................................................3, 5

**Statutes**

18 U.S.C. § 922(g)(8) ....................................................................................................................8, 9

Fed. R. Civ. P. 56(a) ..........................................................................................................................1

Fed. R. Civ. P. 56.1...........................................................................................................................6

N.Y. Admin. Code § 10-135.................................................................................................1, 2, 9, 10

N.Y. Penal Law § 265.01.....................................................................................................1, 2, 9, 10

**PRELIMINARY STATEMENT**

Defendants, by their attorney, Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York, submit this reply memorandum of law in further support of their cross-motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

In this action, Plaintiffs seek to invalidate New York State Penal Law ("Penal Law") Section 265.01 and New York City Administrative Code ("Administrative Code") Section 10-135 which ban the possession, use, and sale of electronic stun guns and electronic dart guns (commonly known as "tasers") in the City and State of New York. Plaintiffs allege that these bans violate their Second Amendment rights to keep and bear arms. However, Plaintiffs cannot show that these weapons are subject to Second Amendment protection because Plaintiffs fail to demonstrate that the use of stun guns and tasers satisfies the two-step analytical framework set forth in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). Indeed, Plaintiffs have not carried their burden at step one of the Bruen analysis because they have not provided evidence that stun guns and tasers are in common use for self-defense and other lawful purposes within the United States.

Contrary to the claims made in Plaintiffs' opposition papers, Defendants correctly apply the two-step analytical framework set forth in Bruen to determine whether stun guns and tasers are subject to Second Amendment protection. Pursuant to the Supreme Court's ruling in Bruen, it is Plaintiffs' burden to demonstrate, through a showing of concrete data, that stun guns and tasers are in common use for self-defense within the United States. As Plaintiffs fail to provide such figures, the analysis could end here. And, even if Plaintiffs could provide data showing that these weapons are in common use, Defendants have satisfied their burden at step two of the Bruen analysis by establishing that Penal Law § 265.01 and Administrative Code

§ 10-135 are "relevantly similar" to the historical tradition of the regulation of other non-firearm weapons from past centuries. Accordingly, Penal Law § 265.01 and Administrative Code § 10-135 clearly pass constitutional muster.

## ARGUMENT

### POINT I

### DEFENDANTS' SECOND AMENDMENT ANALYSIS IS CONSISTENT WITH BRUEN AND SECOND CIRCUIT CASE LAW

Plaintiffs' opposition papers incorrectly dwell on the assertion that Defendants misapply the Bruen framework. In fact, Plaintiffs insist that Defendants "try to dodge [] their burden by claiming the 'plain text' analysis must go on before any historical analysis is conducted, because Plaintiffs bear the additional burden at this stage of first proving the arms are in 'common use for self-defense.'" See Plaintiffs' Memorandum of Law in Reply and in Opposition to Defendants' Cross-Motion for Summary Judgment, dated June 6, 2024 ("Pl. Opp.") at 4. Plaintiffs are frankly incorrect. Plaintiffs attempt to merge the two steps into one by boiling the entire Second Amendment analysis down to only whether stun guns and tasers are in common use, or, in their formulation of the test, commonly possessed. Besides the fact that Plaintiffs have provided no evidence of common use, or common possession, their argument is inconsistent with Bruen, against the great weight of post-Bruen case law, and contrary to Second Circuit precedent.

Defendants' application of the two-step framework set forth in Bruen to the use of stun guns and tasers is correct. Defendants employ the same Second Amendment analysis here as the Supreme Court did in Bruen and as courts in the Second Circuit have done since Bruen. At step one, the reviewing court must determine "whether the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct…." 597 U.S. at 31. If the answer to this

2

question is in the affirmative, only then will the court turn to the historical inquiry. As part of step one of the analysis employed by Defendants here and in Bruen alike, a "textual analysis" is required to determine whether "the weapon at issue is 'in common use' today for self-defense," and whether it is dangerous and unusual. United States v. Berger, No. 5:22-cr-00033, 2024 U.S. Dist. LEXIS 20259, at *8-9 (E.D. Pa. Feb. 5, 2024) ("following Bruen, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis."); Mintz v. Chiumento, No. 23-cv-795 (MAD/CFH), 2024 U.S. Dist. LEXIS 61699 (N.D.N.Y. Mar. 20, 2024); Lane v. Rocah, No. 22-cv-10989(KMK), 2024 U.S. Dist. LEXIS 1839, at *18 (S.D.N.Y. Jan. 4, 2024). Indeed, the "common use" inquiry remains a part of step one of the Bruen analysis and Plaintiffs bear the burden of showing that stun guns and tasers are in common use at this stage. See Grant v. Lamont, No.: 3:22-cv-01223(JBA) 2023 U.S. Dist. LEXIS 151015, at *13-14 (D. Conn. Aug. 28, 2023) quoting N.A. for Gun Rts. v. Lamont, No. 3:22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880 (D. Conn. Aug. 3, 2023). ("Under Heller and Bruen, Plaintiffs 'bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.'"). See also Berger 2024 U.S. Dist. LEXIS 20259 (citing cases); Steven Rupp et al v. Bonta, No.: 8:17-cv-00746-JLS-JDE, 2024 U.S. Dist. LEXIS 46430, at * 21 (C.D. Ca. Mar. 15, 2024) (because caselaw "expressly asks at step one whether a weapon is in common use today for self-defense, logic suggests this placement means the plaintiff bears the burden of making that showing."); Vt. Fed'n of Sportsmen's Clubs v. Birmingham, 2:23-cv-710, 2024 U.S. Dist. LEXIS 126857, at * 15 (D. Vt. July 18, 2024) ("In sum, according to Bruen, a plaintiff must prove that the regulated weapons are in common use in order to qualify for presumptive

protection under the Second Amendment. Once a plaintiff has done that, the State may justify its regulation by demonstrating that the regulation is consistent with the Nation's historical tradition of firearm regulation.")(internal citations and quotations omitted). Moreover, the City's analysis follows the framework that the Second Circuit used in New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 254-57 (2d Cir. 2015). While Bruen repudiated the second step used by the Second Circuit therein, the first part of the test appears broadly consistent with Bruen. See Srour v. New York City, 22-civ-JPC, 2023 U.S. Dist. LEXIS 190340 (S.D.N.Y. Oct. 24, 2023); Knight v. City of New York, 22-civ-10755 (VEC)(VF), 2023 U.S. Dist. LEXIS 213426 (S.D.N.Y. Nov. 20, 2023). Therefore, any assertion made by Plaintiffs that they do not hold the burden of showing that stun guns and tasers are in common use is clearly without merit.

    To that end, Plaintiffs fail to curate any of their own statistical data demonstrating that stun guns and tasers are in common use, let alone for self-defense. Rather than producing their own evidence, Plaintiffs cite to a handful of non-binding decisions including the concurring opinion in Caetano v. Massachusetts, 577 U.S. 411 (2016) ("[h]undreds of thousands of Tasers and stun guns have been sold to private citizens, with many more in use by law enforcement officers."); People v. Yanna, 297 Mich. App. 137, 144 (Ct. App. 2012) ("there are at least 300,000 tasers and 4,478,330 stun guns owned by private citizens across the United States"); and Avitabile v. Beach, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ("approximately 6.5 million stun guns have been sold to consumers between 2008 and 2020.") Pl. Opp. at 7. However, the data taken from these cases only reflects the number of stun guns and tasers purchased and owned; these numbers do not indicate that these weapons are commonly used for self-defense. Following Bruen, it is now clear that *self-defense* in the event of a confrontation (whether at home or in public) lies at the heart of the Second Amendment. See Bruen, 597 U.S. at 30-31. Accordingly,

4

it logically follows that the type of weapons protected under the Second Amendment must be those that are used for purposes of self-defense. While stun guns and tasers may be commonly used by law enforcement as a less lethal means by which to subdue criminals, Plaintiffs provide no evidence that civilians use stun guns and tasers for purposes of self-defense, especially not in any significant number.

The crux of Plaintiffs' opposition papers argue, albeit incorrectly, that it is Defendants who are required to demonstrate that stun guns and tasers are not in common use. To support this assertion, Plaintiffs cite to Avitabile v. Beach, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) and Maloney v. Singas, 351 F. Supp. 3d 222 (E.D.N.Y. 2018). See Pl. Opp. at 4. However, in Avitabile it was the plaintiff who "solicited sales data from several electronic arms companies" to demonstrate that stun guns and tasers were in common use, which directly contradicts Plaintiffs' arguments here. 368 F. Supp. 3d at 411. Furthermore, Maloney has no precedential value whatsoever as Bruen has rendered the decision in Maloney simply wrong. In Maloney, the court found that the Nassau County District Attorney had "failed to show, by clear and convincing evidence, that nunchakus are not in common use." Maloney, 351 F. Supp. 3d at 236. As noted in great detail above, the court's decision in Bruen clearly contradicts this finding by holding that it is a plaintiff's burden to demonstrate that a weapon is in common use for self-defense. See e.g., Grant, 2023 U.S. Dist. LEXIS 151015, at *13-14; Berger, 2024 U.S. Dist. LEXIS 20259 (citing cases); Rupp, 2024 U.S. Dist. LEXIS 46430, at * 21; Vt. Fed'n of Sportsmen's Clubs, 2024 U.S. Dist. LEXIS 126857, at * 15. Accordingly, both Avitabile and Maloney should be disregarded by this Court.

In their further misapplication of the Bruen framework, Plaintiffs claim that "[d]efendants have failed or refused to carry their burden of demonstrating that [stun guns and

tasers] are *not* in common use for lawful purposes." Pl. Opp. at 9. (emphasis in original). To support this assertion Plaintiffs cite to Bruen for the proposition that "the scope of [second amendment] protection *includes* self-defense, but the right also extends to possession for other 'lawful purposes'" and that it is "clear that possession is what the Supreme Court meant for purposes of 'common use.'" Id. at 8-9. (emphasis in original). Despite the fact that Plaintiffs incorrectly impute this burden onto Defendants, Plaintiffs cannot demonstrate this legal principle applies to the possession of stun guns and tasers. Unlike rifles and handguns which could be used for lawful purpose such as hunting, (see Pl. Opp. at 9), Plaintiffs fail to proffer any other lawful purposes for which stun guns and tasers can be used. Each named Plaintiff states in their declarations that they want a stun gun or taser solely for purposes self-defense (i.e., Plaintiff Nunzio Calce wants to "buy and possess a stun gun and taser to protect himself and his family both at home and in public;" and Plaintiff Allen Chan "would like to buy and possess a stun gun and taser to protect himself both at home and in public."). Defendants' Local Rule 56.1 Statement, (Dkt. No. 39), ¶¶ 1-2.[1]

Ultimately, Plaintiffs have failed to satisfy their burden under step 1 of the Bruen analysis. Plaintiffs do not provide any evidence demonstrating that stun guns and tasers are in

---

[1] To that end, Plaintiffs further allege that Defendants' focus on the inherently dangerous nature of stun guns and tasers and their widespread criminal appeal is a red herring. Pl. Opp. at 10. To support their position, Plaintiffs claim that the Heller majority considered the same "essential [safety] concerns that Defendants press here" and found them immaterial. The Heller court, as explained by Plaintiffs, found these safety concerns irrelevant with respect to whether firearms were protected because such question "does not turn on whether arms are misused by criminals; it turns on, inter alia, whether law-abiding citizens commonly own and use them for lawful purposes, and it was enough in Heller to secure constitutional protection that handguns are *typically* possessed for lawful purposes." Id. at 10. (emphasis in original). Here, however, as stated above, Plaintiffs fail to demonstrate what lawful purposes stun guns and tasers are used for in society.

common use in the United States, let alone in New York City,[2] for purposes of self-defense. Thus, they have not shown that their proposed conduct--possession of stun guns and tasers--is protected by the Second Amendment and their Second Amendment claim fails at the first step of Bruen. See Rupp, 2024 U.S. Dist. LEXIS 46430 at *21-22.

## POINT II

**DEFENDANTS HAVE SUCCESSFULLY DEMONSTRATED THAT THE REGULATION OF STUN GUNS AND TASERS IS RELEVANTLY SIMILAR TO THE HISTORICAL TRADITION OF THE REGULATION OF OTHER NON-FIREARM WEAPONS IN THE UNITED STATES**

Plaintiffs allege that Defendants have fallen "far short of carrying their actual burden on the historical prong" as Defendants "elect to construct a sweepingly broad concept of a 'historical tradition' as the yardstick for purposes of making any purported historical comparison." Pl. Opp. at 12.

Plaintiffs fail to acknowledge that under Bruen courts adopt a flexible approach to reason by analogy, which does not demand a "distinctly similar historical regulation," but instead assesses historical laws to determine whether they "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Bruen, 597 U.S. at 29. Tellingly, the Supreme Court determined as much in its recent decision in United States v.

---

[2] Plaintiffs further fail to address Defendants' argument that allowing unrestricted possession and use of stun guns and tasers presents even more risk in a city as densely populated as New York City. In fact, in the context of firearm licensing, the Bruen court opined that it was "easy to see" why seven jurisdictions--all of which were among the most densely populated jurisdictions in the country--"might choose to regulate firearm carriage more strictly than other states." See Bruen, 597 U.S. at 100-101 ("densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas."). Accordingly, unregulated use of tasers and stun guns by untrained individuals presents a unique danger in a city like New York that must account for "8.5 million people living in 303 square miles." Id. at 91.

Rahimi, 219 L. Ed. 2d 351 (2024). In that case, Rahimi was indicted under 18 U.S.C. § 922(g)(8) which prohibits individuals who are subject to domestic violence restraining orders from possessing firearms. Id. at 356. Rahimi challenged the federal statute arguing that it violated his Second Amendment right to bear arms. Id. at 356-357. In determining whether the federal statute was constitutional, the court was required to determine whether the challenged regulation was "consistent with the principles that underpin our regulatory tradition." Id. at 363. It appears evident that this phrase represents a deliberate effort to soften Bruen's Second Amendment approach. See United States v. Herriott, No. 23-cr-37, 2024 U.S. Dist. LEXIS 110555, at *5 n.1 (N.D. Ind. June 24, 2024). In conducting this analysis, the court found that it "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." Id. The Supreme Court further noted that "the law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" Rahimi, 219 L. Ed. 2d at 364 quoting Bruen, 597 U.S. at 30 ("[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

To that end, the Supreme Court compared the federal statute prohibiting individuals with domestic violence restraining orders from possessing firearms to seventeenth century surety laws and even earlier "going armed" laws.[3] Although not "dead ringers," the Court found that 18 U.S.C.S. § 922(g)(8) fits comfortably within the country's tradition of prohibiting individuals who threatened physical harm to others from misusing firearms. Id. The Court expanded on this by stating that "together, the surety and going armed laws confirm what

---

[3] Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond." Rahimi, 219 L. Ed. 2d at 366. If a bond was posted and that individual disturbed the peace, the bond would be forfeited. Id. Going-armed laws prohibited "riding or going armed, with dangerous or unusual weapons [to] terrify[] the good people of the land." Id. at 359 (internal quotations and citations omitted).

8

common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed consistent with the Second Amendment" and that "18 U.S.C.S. § 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be. Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." Id. at 367.

Similarly here, Defendants clearly establish that Penal Law § 265.01 and Administrative Code § 10-135 are "relevantly similar" to the regulation of less-lethal non-firearm weapons throughout the Nation's history. Indeed, Defendants compare the present day regulation of stun guns and tasers to the regulation of other non-firearm weapons including Bowie knives, clubs and other blunt weapons, and toy guns which were popular throughout the 1700s and 1800s. See Defendants' Memorandum of Law in Support of their Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. No. 43), p. 18-21. The impetus for the enactment of widespread regulation of Bowie knives, blunt weapons, and toy guns centuries ago was their ever-increasing association with criminal activity and violence. See Declaration of Samantha Schonfeld ("Schonfeld Dec.")(Dkt. No. 42), Ex. B at p. 18. For example, Bowie knives, which were often used in combat, duels, brawls, and other criminal activities, became heavily regulated in the 1830s. Id. at p. 18. Twenty-nine states enacted laws that barred their carry "whether concealed or openly," while other states "imposed taxes on individuals' acquisition or possession of them." Id. at p. 17-18. The practical utility of these carry restrictions "was precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through

9

weapon-fueled violence." Id. at p. 18. Laws were also enacted to restrict the widespread criminal use of blunt weapons including billy clubs, slungshots, sandbags and bludgeons. Fifteen states prohibited bludgeon carrying and 16 states had anti-billy club laws—the earliest of which was enacted in Kansas in 1862. Id. at 22.

Similarly, between 1970 and the early 2000s, states across the country began regulating stun guns and tasers due to their increased association with criminal activity, including robbery. In particular, stun guns and tasers "gained popularity among robbers who use the devices to intimidate victims into cooperation." Id. at 8. Moreover, stun guns and tasers were the preferred weapons of choice for individuals engaging in criminal activity because they were less lethal and less expensive than firearms, readily available, less likely to be mistaken for firearms by police in a perpetrator-police encounter, and in most places do not result in sentence enhancement if used in crimes (unlike firearms). Id. In light of their increased criminal use, "[a]t least seven states, including New York State, enacted laws that barred civilian possession of stun guns and tasers." Id. at 6; Defendants' Stmt. ¶ 24. Additionally, approximately "40 localities in 15 states . . . enacted similar restrictions (including cities, towns and countries)." Id. at 7; Defendants' Stmt. ¶ 25. During this time, "17 states and nearly 130 localities (cities, towns, counties) imposed carry bans." Schonfeld Dec., Ex. B at 7; Defendants' Stmt. ¶ 26. Accordingly, even though Penal Law § 265.01 and Administrative Code § 10-135 are not identical to the laws regulating Bowie knives, blunt weapons, and toy guns throughout this Nation's history, based on the Supreme Court's latest decision in Rahimi, they do not need to be. Rather the prohibition on the possession of stun guns and tasers fits neatly within the tradition that the historical laws concerning Bowie knives, blunt weapons and toy guns establish –

10

regulation of non-lethal, non-firearm weapons associated with criminality. Rahimi, 219 L. Ed. 2d. at 367.

Additionally, Plaintiffs claim that the laws regulating bowie knives, blunt weapons and toy guns cited by Defendants are too recent in this Nation's history to be considered as historical analogues. Pl. Opp. at 15-18. To support this proposition, Plaintiffs allege that "lower courts are bound to look to 1791 given the Court's repeated holdings that (1) 1791 is the key date for interpreting the Bill of Rights against the federal government . . ." Id. at 16.[4]

Contrary to Plaintiffs' assertions, the period after ratification of the Second Amendment "through the end of the 19th century" can be a "critical tool of constitutional interpretation." Bruen, 597 U.S. at 35. Most, if not all, of the non-firearm weapons regulations cited by Defendants as historical comparators to stun guns and tasers were enacted throughout the 19th century—between 1801 and 1900—making them particularly instructive. See generally, Schonfeld Dec., Ex. B at 20-26 ("The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s;" "the oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s;" and "anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s."). Contrary to Plaintiffs' assertions, Defendants' expert's report cites several laws that were created earlier than 1850 (i.e., "in the 1830s, at least six states enacted laws barring the carrying of Bowie knives;" "court upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837-1838, ch. 137, sec. 2;" "the earliest state anti-bludgeon law was

---

[4] In the same breath, Plaintiffs state that "anything that 'long predates' 1791 or 1868 is generally suspect." Pl. Opp. at 16. Such statement leads a reasonable person to believe that any laws or regulations adopted between 1791 and 1868 are appropriate for a historical comparison.

11

in 1799;" "the oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s;"). Schonfeld Dec., Ex. B at p. 10, 14, 212, and 22. Accordingly, as a majority of the laws cited by Defendants were from the late 1700s through the early 1900s, such laws clearly fall within the applicable period for the historical analysis prong of the Bruen framework.[5]

It is clear from the above historical analysis, and the analysis set forth in Defendants' initial moving papers that tasers, stun guns, bowie knives, clubs, and toy guns "follow a nearly identical regulatory pattern." Id. at 26. First, a weapon is invented and developed. Second, the weapon may or may not be patented. Third, the weapon is typically adapted for law enforcement or military use. Fourth, these weapons then spread to "civil society." Finally, if a weapon "becomes associated with criminality or poses a public health or safety problem, calls for regulation ensue." Id. at 27. Stun guns and tasers clearly follow the same regulatory trajectory: (1) stun guns and tasers were developed primarily for law enforcement purposes, not for self-defense; (2) after years of being unregulated, stun guns and tasers found their way into the hands of civil society; (3) the use of stun guns and tasers to commit crime increased; and (4) their increased use in criminal activity ultimately prompted the enactment of laws restricting their possession, sale, and use. "In short, the history of these devices, when considered in the light of historical non-firearm regulations in American history . . . . militates in favor of the current legal restrictions in New York." Id. at 27.

Based on the above, the regulation of stun guns and tasers and non-firearm weapons such as clubs, toy guns, and Bowie knives are "relevantly similar" using the Supreme Court's metrics as set forth in Bruen. And, although these laws may not be "dead ringers," they

---

[5] The Supreme Court in Rahimi once again declined to resolve the dispute between 1791 and 1868. That said, Justice Kavanaugh, who joined in the majority opinion in both Bruen and Rahimi, authored a lengthy concurring opinion in Rahimi explaining the value of post-ratification history in determining exceptions to constitutional rights. Rahimi, 219 L. Ed. 2d at 384-387 (Kavanaugh, J. concurring).

do not have to be as it is the prohibition of the possession of stun guns and tasers by those intending to use them criminally or to engage in violence that fits neatly within the tradition that Bowie knives, blunt weapons and toy gun laws represent. Rahimi, 219 L. Ed. at 367.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied as Plaintiffs fail to carry their burden of demonstrating that stun guns and tasers are in common use for self-defense. Regardless, even if Plaintiffs could show that their proposed conduct is covered by the plain text of the Second Amendment, Defendants have satisfied their burden to demonstrate that the regulation of stun guns and tasers is relevantly similar to the historical tradition of non-firearm weapons regulation in the United States. Accordingly, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion for summary judgment should be granted.

Dated:   New York, New York
         July 26, 2024

                                      Respectfully submitted,

                                      MURIEL GOODE-TRUFANT
                                      Acting Corporation Counsel of the City of New York
                                      Attorney for Defendants
                                      100 Church Street
                                      New York, New York 10007
                                      (212) 356-2183

By:   /s/ *Samantha Schonfeld*
        Samantha Schonfeld
        Assistant Corporation Counsel